**ORAL ARGUMENT:  January 16, 2015**
**12:00 P.M.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re: LEHMAN BROTHERS INC.,

                            Debtor.


BARCLAYS CAPITAL INC. and BARCLAYS BANK
PLC,

            Appellants and Cross-Appellees,

                  v.

JAMES W. GIDDENS, as TRUSTEE for the
SIPA LIQUIDATION of LEHMAN BROTHERS
INC.,

            Appellee and Cross-Appellant.

Case Nos.
11-CV-6052 (KBF)
11-CV-6053 (KBF)


**BARCLAYS CAPITAL INC. AND BARCLAYS BANK PLC OPPOSITION
TO THE TRUSTEE'S MOTION TO CONFIRM THE SCOPE OF THE
COURT'S AMENDED OPINION AND ORDER AND JUDGMENT**

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES..................................................................................................iii

PRELIMINARY STATEMENT .......................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 6

    A.    In September 2008, The Trustee Transferred Its ETD Business And All Of The Assets Used In That Business To Barclays........................................... 7

    B.    All Of LBI's ETD Accounts Were Transferred "In Bulk" To Barclays. ............... 8

    C.    The Transfer Of LBI's ETD Accounts Created Enormous Risk That Barclays Would Never Have Assumed Without Receiving The Margin Assets, Including The Margin Assets The Trustee Now Seeks To Exclude.................... 10

    D.    At Trial, Barclays, The Trustee, And The Court Defined The "ETD Margin Assets" To Include The Assets The Trustee Now Seeks To Exclude. ................ 13

    E.    In Its Appeal Of The Bankruptcy Court's Order Denying Barclays The ETD Margin Assets, Barclays Continued To Claim All ETD Margin Assets, Including Those The Trustee Now Seeks To Exclude. ......................................... 16

    F.    The $4 Billion Estimate At Trial And On Appeal Included The Majority Of The Assets The Trustee Now Seeks To Exclude.................................................... 17

    G.    The Value Of The ETD Margin Assets Has Increased Only Because Of Asset Appreciation And Newly Identified Margin Assets, And The Trustee Concedes That These Additional Amounts Are Covered By The Judgment. ....... 19

ARGUMENT ...................................................................................................................... 21

    I.    THE JUDGMENT ENTITLES BARCLAYS TO ALL OF THE MARGIN ASSETS IT HAS CONSISTENTLY CLAIMED, WHICH INCLUDES THOSE THE TRUSTEE NOW SEEKS TO EXCLUDE. ....................................................... 21

    II.    THE TRUSTEE IS LEGALLY BARRED FROM CONTESTING BARCLAYS' ENTITLEMENT TO THE NEWLY DISPUTED MARGIN. ................................... 24

    A.    The Second Circuit's Mandate Awards All ETD Margin Assets To Barclays, And Precludes The Relief Sought By The Trustee. ............................................. 24

    B.    The Trustee Waived These New Arguments........................................................ 26

III.    IF THIS COURT REACHES THE MERITS OF THE TRUSTEE'S NEW
        ARGUMENTS, THE RECORD MANDATES JUDGMENT FOR BARCLAYS. ... 28

    A.    The Purchase Agreement Entitles Barclays To All Affiliate ETD Margin,
          Including The Newly Disputed Margin For Affiliate ETDs. ............................... 28

    B.    Barclays Is Entitled Under The Purchase Agreement To All Customer ETD
          Account Margin, Including The Newly Disputed Customer Account Margin. .... 33

**TABLE OF AUTHORITIES**

Page

**Cases**

*Air Et Chaleur, S.A. v. Janeway*,
   757 F.2d 489 (2d Cir. 1985) ...................................................................26

*AUSA Life Ins. Co. v. Ernst & Young*,
   119 F. Supp. 2d 386 (S.D.N.Y. 2000) .....................................................26

*Burrell v. United States*,
   467 F.3d 160 (2d Cir. 2006) ....................................................................24

*Chase Manhattan Bank v. Am. Nat'l Bank and Trust Co. of Chicago*,
   93 F.3d 1064 (2d Cir. 1996) ....................................................................22

*Diesel v. Town of Lewisboro*,
   232 F.3d 92 (2d Cir. 2000) ......................................................................26

*Gulf Ins. Co. v. Transatlantic Reins. Co.*,
   886 N.Y.S.2d 113 (N.Y. App. Div. 2009) ...............................................31

*In re Ivan F. Boesky Sec. Litig.*,
   957 F.2d 65 (2d Cir. 2002) ......................................................................24

*In re Rezulin Prods. Liability Litig.*,
   224 F.R.D. 346 (S.D.N.Y. 2004) .............................................................26

*James v. Jamie Towers Hous. Co.*,
   743 N.Y.S.2d 85 (N.Y. App. Div. 2002) .................................................30

*N.Y. Marine and Gen. Ins. Co. v. Lafarge N. Am., Inc.*,
   599 F.3d 102 (2d Cir. 2010) ....................................................................31

*Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*,
   273 F. Supp. 2d 436 (S.D.N.Y. 2003) .....................................................30

*Norton v. Sam's Club*,
   145 F.3d 114 (2d Cir. 1998) ...............................................................26, 27

*Parmalat Cap. Fin. Ltd. v. Bank of America Corp.*,
   671 F.3d 261 (2d Cir. 2012) ....................................................................28

*People v. Houston*,
   424 N.Y.S.2d 726 (N.Y. App. Div. 1980) ...............................................35

*Recinos Villanueva v. Holder,*
    474 F. App'x 28 (2d Cir. 2012) ............................................................26

*Seese v. Volkswagenwerk, A.G.,*
    679 F.2d 336 (3d Cir. 1982) ..............................................................25

*Seiden Assocs., Inc. v. ANC Holdings, Inc.,*
    959 F.2d 425 (2d Cir. 1992) ..............................................................31

*Sompo Japan Ins. Co. of America v. Norfolk S. Ry. Co.,*
    762 F.3d 165 (2d Cir. 2014) ..............................................................27

*Trans Pac. Leasing Corp. v. Aero Micronesia, Inc.,*
    26 F. Supp. 2d 698 (S.D.N.Y. 1998) ................................................29

*U.S. Naval Inst. v. Charter Commc'ns, Inc.,*
    875 F.2d 1044 (2d Cir. 1989) ............................................................35

*United States v. Ben Zvi,*
    242 F.3d 89 (2d Cir. 2001) ................................................................24

*United States v. Dorvee,*
    616 F.3d 174 (2d Cir. 2010) ..............................................................26

*United States v. Vidal,*
    136 F. App'x 438 (2d Cir. 2005) ........................................................25

## <u>Regulations</u>

17 C.F.R. § 190.06(h) ..................................................................................9

## PRELIMINARY STATEMENT

On July 16, 2012, this Court entered a final judgment in this case holding that (a) "The Bankruptcy Court's decision holding Barclays is not entitled to the Margin Assets" (as well as the corresponding orders entered by the Bankruptcy Court) "are hereby REVERSED;" (b) "The Bankruptcy Court's Judgment for the Trustee with respect to the Margin Assets . . . is hereby REVERSED"; and (c) "The Bankruptcy Court is directed to GRANT Barclays' January 29, 2010 Motion to Enforce The Sale Order And To Secure Delivery Of All Undelivered Assets as such motion relates to the Margin Assets" (and to order the Trustee to provide additional specific relief in aid of this granted motion).  [Dkt. 42 at 2-3 ("Judgment").][1]  The Trustee appealed this Court's Judgment to the Second Circuit, and the Second Circuit affirmed this Court's Judgment, issuing a Mandate on October 1, 2014.  The Second Circuit's Mandate awarded all Margin Assets to Barclays —broadly defined as "cash and cash equivalents held by third parties to secure LBI's exchange-traded derivatives ("ETDs") business."  [CA2 ECF 290 at 3].

The Trustee now asks this Court to issue an order that will partially undo its Judgment after it was affirmed on appeal, and will allow the Trustee to carve over $1 billion in Margin Assets out of that Judgment.  The Trustee points to the fact that the estimated value of the Margin Assets has increased since the trial and during the appeal—from approximately $4 billion to approximately $5.18 billion—to suggest that Barclays is seeking additional categories of margin.  But that is false.  The increased valuation reflects two simple facts:  (1) some of the Margin Assets included within the $4 billion estimate have appreciated substantially in value during the appeal—the Trustee does not dispute that Barclays is entitled to this appreciation; and

---

[1] Citations to "Dkt. __" are to the ECF document numbers filed in this Court in this case number 1:11-cv-06052. Citations to "R.____" are to the Record on Appeal that was submitted in electronic form to this Court on October 26, 2011.  Citations to "CA2 ECF __" are to filings or the opinion in the Second Circuit appeal, found on the Second Circuit docket, *In re Lehman Bros. Holdings Inc.*, 12-2322, 12-2933.

(2) after the $4 billion estimate was made, the Trustee and Barclays identified additional Margin Assets that indisputably fall within categories always claimed by Barclays ("Subsequently Identified Margin Assets").  The Trustee does not dispute that Barclays is entitled to most of these Subsequently Identified Margin Assets.  He disputes only a subset of those Subsequently Identified Margin Assets (roughly $465 million)—*not* because they were subsequently identified, but solely because they fall into one of two categories as to which he now asserts arguments that he has never asserted before.  At the same time, the Trustee asks the Court to carve out from its Judgment more than $700 million in Margin Assets that *were always included in the $4 billion estimate*.  Thus, the Trustee's motion has nothing to do with the Subsequently Identified Margin Assets; rather, he is trying to modify the Judgment to claw back categories of Margin that were *always claimed* and *always covered* by the Judgment.  The Trustee's effort is barred by the Mandate Rule and his own waiver.  Moreover, his belated claims have no merit.

According to the Trustee, this Court should "confirm" that its Judgment did not fully reverse the decision of the Bankruptcy Court on the Margin Assets—even though that is plainly what the Judgment states.  The Trustee claims the Judgment only *partially* reversed the Bankruptcy Court's decision because Barclays changed the definition of "Margin Assets" on appeal so as to seek only a subset of the "Margin Assets" it sought at trial.  He says that Barclays waived its claims to a portion of the LBI proprietary Margin that secured LBI's trading of exchange-traded derivatives ("ETDs") on behalf of affiliates, and to a portion of LBI proprietary Margin that secured LBI's trading of ETDs on behalf of customers.  But that is false.  In the "Statement Of Issues On Appeal" filed with this Court on August 29, 2011, Barclays expressly stated that the "Margin Assets" had the same definition "*as defined in the Appealed Orders*." [Dkt. 3 at 3].  The "Appealed Orders" issued by the Bankruptcy Court adopted the definition

used by the Bankruptcy Court in its decision:  i.e., "LBI property used to support trading conducted by LBI on its own behalf *and on behalf of its customers and affiliates*."  [Dkt. 1, Ex. 1; R.66878].  The parties and the courts continued to refer to the same universe of Margin Assets that had been claimed and disputed in the Bankruptcy Court and that was estimated to be worth "approximately $4 billion"—and *included* the two categories of Margin Assets now disputed by the Trustee.  Neither Barclays, nor the Trustee, nor any court ever stated that the universe of Margin Assets had been narrowed or any claim had been waived.

The specific categories of Margin Assets that the Trustee now seeks to carve out of this Court's Judgment are:  (1) LBI proprietary assets held in accounts at clearing organizations and banks to secure some of the ETDs that LBI cleared on behalf of its affiliates ("Newly Disputed Margin for Affiliate ETDs"); and (2) LBI proprietary assets held in accounts at clearing brokers through which LBI cleared ETDs on behalf of customers, but which had no open ETD positions on the day the Sale closed ("Newly Disputed Customer Account Margin").  Both categories were included in the definition of Margin Assets Barclays sought throughout the Bankruptcy Court trial, and continued to seek on appeal.  Barclays never waived its claim to either.  Moreover, both categories were "held by third parties to secure LBI's exchange-traded derivatives ('ETDs') business," and therefore are covered by the Second Circuit's mandate.  [CA2 ECF 290 at 3].

The Trustee claims that this Court narrowed the definition of Margin Assets by defining them as "property that may be held to secure obligations under the exchange-traded derivatives transferred to Barclays in the Sale."  According to the Trustee, certain affiliate-owned ETDs were not "transferred" to Barclays in the Sale, and therefore the Margin associated with those ETDs was also not transferred.  But that is false.  All of LBI's affiliate-owned ETDs *were* transferred to Barclays in the Sale.  The Trustee is inaccurately conflating whether the ETDs

3

were "purchased" by Barclays (which Barclays did not do with respect to any affiliate-owned or customer-owned ETDs) with whether the ETDs were "transferred" to Barclays.  He also conflates ownership of the ETDs with ownership of the Margin Assets that secured them.  The fact that Barclays did not acquire certain ETDs (i.e., those not owned by LBI) for its own proprietary account is irrelevant:  the ETDs were transferred to Barclays because, as Barclays showed throughout the trial, it acquired the settlement responsibility for *all* of the ETDs cleared through LBI's accounts, and thereby stepped into a massive responsibility of unknown amount that it would never have assumed without also obtaining *all* of the ETD Margin Assets.

Moreover, the Trustee's argument is self-contradictory.  First, the Trustee admits that the Judgment entitles Barclays to most of the Margin Assets securing customer ETDs, even though Barclays did not "acquire" or "purchase" those ETDs for its proprietary account.  Second, the Trustee admits that the Judgment entitles Barclays to the Margin Assets that secured the affiliate-owned ETDs at the Options Clearing Corporation ("OCC"), even though Barclays did not acquire those ETDs for its proprietary account.  By contrast, the Trustee claims Barclays is not entitled to any of the *other* Margin Assets that secured the *other* affiliate-owned ETDs, even though those ETDs were transferred to Barclays in just the same way as were the customer-owned ETDs and the affiliate-owned ETDs at the OCC.  Nothing in the Purchase Agreement or the decisions of this Court or the Second Circuit supports these self-contradictory positions.

The Trustee's argument is also refuted by the undisputed facts.  *All* of the affiliate-owned ETDs were transferred to Barclays in the Sale, both those cleared at the OCC and those cleared elsewhere, just as all customer-owned ETDs were transferred to Barclays.  The ETD exchanges and clearinghouses (including but not limited to the OCC) refused to allow LBI to retain *any* ETDs, including affiliate-owned ETDs.  For that reason, the CFTC authorized a "bulk transfer"

of *all* of LBI's futures accounts, pursuant to which Barclays stepped into LBI's shoes and took responsibility for *all* ETDs in *all* of those accounts.  After the Sale, LBI's ETD accounts—including those through which it cleared affiliate ETDs—were "renamed" in Barclays' name, and Barclays then closed out the affiliate-owned ETDs along with the LBI proprietary ETDs, incurring significant losses in doing so.  None of those losses were borne by the LBI estate.  This bulk transfer was a "finality event" for LBI as an ETD clearing agent, and it meant that LBI was being taken out of the business of holding and clearing ETDs altogether.  [R.58050-51].  The suggestion that LBI "retained" *any* ETDs is simply a fiction fabricated to support the Trustee's attempt to claw back certain assets that Barclays has always claimed.

Most of the affiliate-owned ETDs were held through LBI proprietary or "house" accounts.  As the Trustee's own "corrected" motion illustrates, it has taken over six years (and counting) to determine which of the ETDs in these accounts were affiliate-owned and which were proprietary.  There was no way for the parties to determine this prior to the Sale, and if Barclays had not stepped in and closed out *all of the positions* in the house accounts (including affiliate-owned positions) immediately after the Sale, there is no telling how much Margin would have been lost.  It was impossible during the week of the Sale (or for many months thereafter) to disaggregate the LBI-owned ETDs and the affiliate-owned ETDs, and thereby to disaggregate the risk—and Margin—associated with the affiliate-owned ETDs.  Any such arrangement would have required extensive contractual "plumbing" providing for that disaggregation and claw back.  No one ever discussed doing this, no contractual language provides for it, and none of the exchanges would have allowed it.

The Trustee also asserts that Barclays has never before claimed Margin Assets held in customer ETD accounts that did not contain open positions when the Sale closed.  This too is

false.  Barclays has consistently sought all of the proprietary Margin Assets in all of the customer ETD accounts, and never disclaimed any of those assets, even where an account had no open ETD positions at the closing.  For example, before the Sale closed, Barclays told the CFTC and the Trustee that the Purchase Agreement would transfer to Barclays all of LBI's *customer* ETD accounts, *including* those "that contained *no open commodities positions*."  [R.54358].  At trial, Barclays produced a chart identifying every customer ETD account that held assets it claimed, which included *every* customer ETD account known to Barclays at the time, including accounts with no open positions.  [R.3706].  By contrast, Barclays told the Trustee and the CFTC before the Sale that any *house* accounts that had no open positions at the time of the Sale were *not* being transferred to Barclays, and Barclays' chart of claimed *house* accounts produced in the litigation omitted all house accounts known at the time to contain no open positions.  The Trustee simply disregards this careful distinction between house and customer accounts that Barclays made expressly and consistently both before and after the Sale.

In short, it is the Trustee, not Barclays, who has waived any claims relevant to this motion.  From the beginning of this litigation, the Trustee chose to make an all-or-nothing argument:  he claimed that Barclays was entitled to *no* Margin Assets, and chose not to argue in the alternative that, even if Barclays was entitled to some Margin Assets, it was not entitled to the sub-categories of Margin Assets now addressed in his motion.  The Trustee is not entitled to raise new fallback arguments at this stage:  the Mandate Rule precludes him from raising such arguments, and he waived them by failing to present them at trial, before this Court, or in his appeal to the Second Circuit.

## STATEMENT OF FACTS

To support his untimely and barred motion, the Trustee inappropriately presents this Court (which is acting in an appellate capacity only) with a host of new evidence that the Trustee

never previously presented.  [*See* Dkt. 56-3 (Corrected Declaration of Trustee lawyer Sam McCoubrey)].  This evidence is not in the trial record, and is not even part of the court record on appeal (i.e., it was not presented in any of the submissions during either appellate proceeding).  It includes summary calculations performed by the Trustee to show how he has "allocated" Margin Assets between affiliate-owned ETDs and proprietary ETDs.  [*Id.* at ¶¶ 11-19].  That the Trustee has to present this appellate Court with new facts about recent "allocation" calculations confirms that his motion is improper:  he is trying to use new facts and new arguments to try to persuade this Court to modify its Judgment.

Barclays summarizes the relevant facts below through citations to the trial record and the appellate submissions and decisions.  In addition, in case this Court decides to consider the Trustee's factual declaration, we attach a declaration from a Barclays outside lawyer that addresses some of the Trustee's new factual assertions and mischaracterizations, and does so with citations to the trial record and the submissions and decisions on appeal.  In places, this declaration also informs the Court of facts the parties have learned during the appellate proceedings, and that are necessary to correct the Trustee's mischaracterizations.

### A.     In September 2008, The Trustee Transferred Its ETD Business And All Of The Assets Used In That Business To Barclays.

As part of its emergency purchase of LBI's North American broker-dealer business, Barclays acquired LBI's exchange-traded derivatives ("ETD") business (the "ETD Business"). [*See* CA2 ECF 290 at 11-12].  The ETD Business included *all* of the "ETD positions" that LBI held, whether for its own account or on behalf of its affiliates or non-affiliated customers, and "all of the necessary assets" used to operate that business.  [*Id.* at 11-12].

The ETDs that LBI held on its own behalf and on behalf of its affiliates were typically contained in "house" or "proprietary" accounts (the "House Accounts") that LBI maintained with

various clearing corporations and clearing brokers through which it traded in ETDs ("clearing organizations"). [R.3698; R.58052]. LBI maintained its own proprietary assets in the House Accounts to secure its obligations to these clearing organizations under both the proprietary and affiliate ETDs. [R.57736; R.58052, R.58056]. The ETDs LBI held on behalf of non-affiliated customers were in customer accounts (designated as customer "segregated" or "secured" accounts) that LBI maintained with its various clearing organizations, and LBI held proprietary assets, as well as customer-owned assets, in these accounts (as well as in other customer "segregated" and "secured" bank accounts ) to secure its obligations in relation to these customer ETDs (the customer "segregated" and "secured" accounts are both referred to herein as "Customer ETD Accounts"). [R.58470-71; R.57733-34, R.57736-37, R.57746; R.58051-52; R.3284-86, R.3294]. LBI had clearing responsibility (or settlement responsibility) for *all* of the ETDs in *all* of its House and Customer ETD Accounts. [*Id.*].

**B.**     **All Of LBI's ETD Accounts Were Transferred "In Bulk" To Barclays.**

The transfer of LBI's ETD business to Barclays meant that Barclays was stepping into LBI's shoes with respect to all of LBI's House and Customer ETD Accounts that LBI maintained with the clearing organizations through which it traded in ETDs in the United States and abroad ("LBI's ETD Accounts"). This "bulk transfer" of LBI's ETD accounts was the only arrangement that LBI's clearing organizations would accept, since they were no longer willing to recognize LBI as a viable clearing member. [R.21570-73; R.2636; R.2866; R.2943; R.58049-55, 58059-60]. Notably, it was not just the OCC that took this position; *every* relevant clearing organization made this perfectly clear in the days leading up to the Sale. [R.58049-50, 58059-60]. The only alternative to such a "bulk transfer" was a wholesale *liquidation* of LBI's ETD Accounts, which carried risks for LBI and its customers and affiliates far beyond the loss of the

8

assets already posted to those accounts.[2]  Any piecemeal transfer of LBI's ETD Accounts would also have been impossible because LBI could not even *identify* the universe of ETDs and accounts, and hence could not have agreed to transfer some but not others.[3]

As explained at trial, Barclays and LBI ETD professionals arranged for a bulk transfer of all of LBI's ETD Accounts to Barclays, and made arrangements with each of the relevant clearing organizations to implement that bulk transfer.  [R.58050-52].  After getting sign-off from the individual clearing organizations, a bulk transfer of all of LBI's ETD accounts to Barclays still required approval by the U. S. Commodity Futures Trading Commission ("CFTC").  *See* 17 C.F.R. § 190.06(h); [R.58476].  Barclays requested that approval on September 19, 2008.  R.54355-60.  Barclays explained in that letter that LBI and Barclays "entered into an Asset Purchase Agreement ('Agreement')" on September 16, 2008, pursuant to which  "LBI will transfer [to Barclays] *all customer accounts,*" including "*accounts that contain no open commodity positions.*"  [R.54358].  Barclays explained in its request to the CFTC that LBI's "house accounts" were also "within the scope of this request," but that in contrast to customer accounts, which were *all* being transferred, only those *house* accounts that have not "been liquidated by the time the transfer occurs" will be transferred.  [*Id.*].  The CFTC granted Barclays' request that same day, copying the Trustee, thus approving the bulk transfer of *all* of LBI's *Customer* ETD Accounts—*including* those that contained *no open positions*, and *all* of

---

[2] [R.1594, R.1639 (noting the massive losses resulting from the CME liquidation as a testament to the fact that "This administration is finished if this transaction is not completed, Your Honor."); R.58471, 58473-74; R.57744-45; R.24841 at ¶ 73, R.24872-73; R.58054-55, 58057-60; R.56644.  *See also* CA2 ECF 290 (Second Cir. Op.) at 16].

[3] [*See, e.g.*, R.57735 ("We spent a lot of time with the Lehman futures employees, trying to understand where they had positions, what brokers they used, where they held their bank accounts, where they held their money market funds. . . .  We didn't actually get any of the open positions that there were or the size of the amount of money or collateral that they were holding and the reason being is Lehman's books and records were in such a mess, I don't even actually think they knew themselves where they were."); R.3042 (noting that, even after the Sale closed, LBI had "absolutely no idea" what its risk position was at the OCC and did not even know "what has been booked to what entity")].  Indeed, even today – *more than six years later* – the Trustee is still trying to determine which of LBI's House ETD Accounts contained affiliate ETDs, which contained proprietary ETDs, and which contained a mixture of the two.  [Dkt. 56 at ¶ 8].

LBI's *unliquidated* House Accounts.  [R.54369-73].  As the Trustee admits, LBI's House ETD

Accounts (and in at least one case, an LBI Customer ETD Account) contained *affiliate-owned*

*ETDs*.  [Dkt. 67 at 8].  Thus, by virtue of the bulk transfer, the affiliate-owned ETDs were

transferred to Barclays, who became the responsible clearing member for those ETDs.

This bulk transfer was a "finality event" for LBI as an ETD clearing agent, and it meant

that LBI was being taken out of the business of holding and clearing ETDs altogether.  R.58050-

51.  It was implemented by "re-naming" all of LBI's ETD Accounts (other than fully liquidated

house accounts) into Barclays' name, and, after the Sale, the Trustee instructed LBI's clearing

organizations and custodians to "amend the Tax Payer ID" and to "change the account titles to

reflect Barclays Capital Inc."  [R.3268-72; Bloomer Decl., Ex. 1].  Barclays then carried on as

Futures Commission Merchant ("FCM") to LBI's former customers with respect to the customer

ETDs transferred in the Sale; with respect to the proprietary and affiliate-owned ETDs, Barclays

eliminated further exposure by closing out those positions.[4]

**C.     The Transfer Of LBI's ETD Accounts Created Enormous Risk That Barclays Would Never Have Assumed Without Receiving The Margin Assets, Including The Margin Assets The Trustee Now Seeks To Exclude.**

This Court and the Second Circuit have already recognized that Barclays would not have

accepted the transfer of LBI's ETD Accounts (and associated liabilities) without the margin held

in those accounts offsetting that risk.  [*See* CA2 ECF 290 at 15-16; Dkt. 41 at 27 n.16].  The

accounts containing the categories of margin now disputed by the Trustee are no exception.

Just as with customer ETDs, the transfer of affiliate-owned ETDs to Barclays carried

huge risk and potential liability for Barclays even though the ETDs were "owned by" LBI's

---

[4] [*See* R.3699 at ¶11 (affiliate-owned ETDs were commingled with proprietary ETDs in LBI's house accounts); R.3698-99 at ¶8 (all positions in LBI's house accounts closed out after the Sale, with costs being deducted from the margin in those accounts); R.3698-99 at ¶¶ 8-11 (post-sale close-outs included affiliate-owned ETDs at the OCC *and elsewhere*); R.3699 at ¶ 12 (Barclays had authority to close out ETDs owned by LBI's bankrupt affiliates)].

*bankrupt* affiliates.  As witness after witness explained at trial, even though Barclays did not

"acquire" the affiliate-owned ETDs, their transfer to Barclays in the Sale made Barclays

responsible for the associated settlement obligations.  [*See* R.58074 (explaining the difference

between (1) "the risk of settlement and the risk to the clearing house being absorbed by

Barclays," and (2) "the ownership of the position not being, because the position continues to be

owned by the Lehman affiliate"); R.57733 and 57742-43; R.58470].  And, "the ability of these

affiliates to perform and meet margin calls . . . was a real risk, and that was a risk that Barclays

was assuming and was, if you will, stuck with as part of the deal."  [R.58074; *see also* R.57742-

43 ("credit risk" was "especially pronounced for customers who were Lehman affiliates" because

"most of the Lehman affiliates were in trouble and bankrupt, exactly the same as LBI, LBIE

were")].  The costs of carrying and closing out the affiliate-owned ETDs were *borne by Barclays*

out of the margin that was transferred to it in the Sale—they were *not* borne by the LBI estate.

[*See* R.3699 at ¶¶ 8-12; R.2322; R.57901; R.58470].

    The transfer to Barclays of LBI's Customer ETD Accounts and all of LBI's customer-

related obligations also brought huge risk and unquantifiable potential liability for Barclays.  At

trial, Barclays presented *unrebutted* testimony explaining the significant obligations Barclays

assumed by taking over LBI's customer ETD business, which included LBI's liabilities to its

customers as well as to the clearing organizations through which it dealt.  [R.57742-43; R.57424,

R.58054-59, 58074; R.58469-71; *see* R.56733].  No one could quantify these liabilities at the

time because LBI's books and records—and its customer accounts in general—were in utter

disarray during the week of the Sale, with positions being forcibly liquidated by ETD exchanges,

while no one at LBI kept up with this frantic activity.  As one witness explained:

> "At the time of us taking over on the 22nd, Lehman's would not give us the total
> assets they were holding for their customers and where it was being held and even

what their full positions were.  They had no idea.  So they couldn't tell us this is the total amount of money that we owe to customers, this is the total amount of money we have with the broker, this is the total amount of the money we have with the exchange.  Which is extremely scary.  These numbers that have been put together were put together by the finance guys months afterwards.  It took about two months for us to clean up the books and records that were given to us by Lehman . . .  So when you pick up and move a futures business, you take every account that is designated as seg. and secured to insure you can pay back your customers.  Could Lehman tell us what was in those accounts?  No, not in any way, shape or form."[5]

The risks Barclays assumed did not depend on the existence of open positions in the Customer ETD Accounts.  As just a few examples, there were obligations to pay settlement/variation margin to the clearing organizations in respect of positions previously closed out, obligations to make settlement payments for positions that had already settled or gone to delivery, and payables for premiums on long positions that were acquired in order to close out corresponding short positions.  [R.3314-15].[6]  The liabilities Barclays was assuming would terminate only after any such resulting liabilities or deficits to the clearing organizations were satisfied and after customers were credited in full for their ETD trades.  Indeed, the schedule that the Trustee attached as Exhibit 1 to his supporting declaration illustrates that there *were* deficits in certain of LBI's Customer ETD Accounts even though there were no open positions.  [*See* Dkt. 68, Ex. 1].  Pre-Sale communications between the parties confirmed Barclays' assumption of such liabilities and deficits.  [*See* R.54358 (explaining that, pursuant to the APA, "LBI will transfer all customer accounts" to Barclays and that "[s]ome of these accounts are accounts that contain no open commodity positions and accounts that are in deficit")].  And as explained in the

---

[5] [Bloomer Decl., Ex. 4 (testimony of ETD professional Liz James)].

[6] As a further example, Barclays showed at trial that it incurred over $100 million in customer-related costs after the Closing in foreign currency liabilities to LBI's former customers and compensation to LBI's former customers for ETDs that had been inadvertently closed out during the chaos surrounding the Lehman bankruptcy.  [R.57743]. These liabilities bore no relationship to whether there were open positions in a particular account, and, indeed, in the latter example, it was an exchange's inadvertent *close-out* of customer positions (which LBI had improperly commingled with proprietary positions in a house account) that *gave rise* to $40 million in liabilities for Barclays to one of LBI's former customers.  [*Id.*].

above testimony, Barclays had no assurance at the time the Sale closed whether the assets held in LBI's Customer ETD Accounts would be sufficient to satisfy all of these obligations.

Finally, Harvey Miller, Lehman's lead attorney, testified that LBI's business was a "melting ice cube" that was "already half melted" by the time of the Sale, that the exclusion of "free cash, unencumbered cash" did *not* refer to "margin cash associated with the customer's account"—whether it be proprietary or customer property.  [R.56172-73].  He likewise testified he fully understood Barclays was acquiring all of the assets—proprietary and customer alike— held in all of Lehman's Customer ETD Accounts because "as a general proposition, with the accounts being transferred, everything relating to those accounts was being transferred."  [*Id.*].

> **D.**    **At Trial, Barclays, The Trustee, And The Court Defined The "ETD Margin Assets" To Include The Assets The Trustee Now Seeks To Exclude.**

In its Motion to Enforce the Sale Order, Barclays sought "all property used to secure *obligations* under *any and all* exchange-traded derivatives ('ETD Margin')."  [R.60603 (emphasis added); 60606 (Proposed Order)].  Barclays never sought delivery of a specific value of Margin Assets.  It sought *all* Margin Assets, regardless of their value.  That reflects the fact that the Purchase Agreement lists categories of Purchased Assets without listing their values, which were indeterminable.  [R.66482 at 50:18-51:6; R.61 at ¶ 1(a)].

In addition, as shown below, Barclays explicitly claimed at trial (a) all of the margin that secured all of the affiliate-owned ETDs in LBI's ETD Accounts ("Affiliate ETD Margin"), including the Newly Disputed Margin for Affiliate ETDs, and (b) the margin in *all* of LBI's Customer ETD Accounts ("Customer ETD Account Margin"), including the Newly Disputed Customer Account Margin (Newly Disputed Margin for Affiliate ETDs and Newly Disputed Customer Account Margin referred to collectively as "Newly Disputed Margin").

The Trustee *admits* that Barclays sought all Affiliate ETD Margin at trial, [Dkt. 67 at 9-

10], and the parties' submissions and court rulings establish that it did.[7]  This was not limited to Affiliate ETD Margin *at the OCC*; Barclays claimed *all* Affiliate ETD Margin *everywhere*. [Dkt. 67 at 10 (acknowledging that Barclays "expressly claimed the [disputed] Affiliate Collateral" at trial)].  Barclays also fully explained the basis for that claim: that affiliate-owned ETDs, like all other ETDs in LBI's ETD Accounts, were transferred to Barclays in the Sale, along with the LBI proprietary assets "held to secure" them, and that it would have been irrational for Barclays to take responsibility for those positions *without* the Margin, since LBI's affiliates were mostly bankrupt.  [R.57742-43; R.58074; R.58470-71].

The Trustee *never* argued or offered any evidence at trial suggesting that *any* of the affiliate-owned ETDs were "not transferred to Barclays in the Sale."  And the Trustee *never* presented an alternative argument before Judge Peck that, even if he were to grant Barclays' claim to certain of the claimed Margin Assets, he should deny Barclays' claim to the extent it encompassed Affiliate ETD Margin.  Instead, the Trustee opted for the all-or-nothing approach of claiming that *no Margin Assets of any kind* were conveyed to Barclays.[8]

Barclays was likewise explicit throughout the trial that its claim included all of the Customer ETD Account Margin, including the Newly Disputed Customer Account Margin. Barclays produced a chart in the bankruptcy litigation that identified the Margin Assets it claimed, which included the Margin Assets in Customer ETD Accounts with no open positions.

---

[7] [*See* R.61050 (Barclays 1/29/10 Bankr. Br.) ("Some of these accounts were designated as proprietary (or 'house') options or futures accounts and used to hold and trade ETD positions on behalf of LBI (and sometimes, certain of LBI's affiliates)."); R.64850 at ¶ 265 (Barclays 11/22/10 Post-Trial Br.); R.66935 at ¶ 80 n.34 (Barclays 4/28/11 Bankr. Br.); R.64546 at ¶¶ 173-74 (Trustee 11/22/10 Post-Trial Br.) ("The disputed Margin Assets consist of LBI property that was used to support both LBI's own proprietary trading and trading that LBI did on behalf of its customers and affiliates."); R.66878 (2/22/11 Bankr. Ct. Op.) ("The Margin Assets consist of LBI property that was used to support trading conducted by LBI on its own behalf and on behalf of its customers and affiliates.")].

[8] As noted below, all the Trustee did say with respect to the affiliate-owned ETDs was that Barclays did not "*acquire*" them.  [*See* R.61349 (Trustee 3/18/10 Reply Br. at ¶106, n.18)].  This is true, but beside the point: Barclays did not *acquire* affiliate-owned ETDs, just as it did not *acquire* any other non-proprietary ETDs.  But the affiliate-owned ETDs *were transferred* to Barclays, and the Trustee has never claimed otherwise.

[R.3706].  Barclays did not differentiate between customer accounts with and without open positions because *all* Customer ETD Accounts had been transferred.  [R.54358].  After questioning Barclays' witnesses about this chart, the Trustee asked Barclays to identify the specific custodian and broker statements that related to those accounts, which Barclays did. [R.25074].  Those statements confirmed that Barclays' claim encompassed the assets in at least four Customer ETD Accounts with no open positions at the time of the Sale.  [*See* R.3706; R.25119; R.25095; R.25094; R.25080].  In defining the disputed Margin Assets in his post-trial proposed findings of fact, the Trustee himself cited the very statements that confirmed they included accounts with no open positions.  [R.64546 at ¶173, n.18; R.50727 (M.677); R.50778 (M.690)].  Finally, Barclays introduced into evidence the CFTC bulk transfer order, and the request that led to it, which further confirmed that Barclays' claim encompassed margin held in Customer ETD Accounts that contained "*no open commodities positions*."  [R.54358; R.54371].

While Barclays claimed the assets in all of LBI's *Customer* ETD Accounts in the litigation, it did *not* claim assets held in LBI's *House* ETD Accounts that contained no open positions at the time of the Sale (the "Liquidated House Accounts"), as to which Barclays "didn't assume the risk."  [Dkt. 51, Ex. 3 (James Dep. Tr.) at 255:13-21; *see also* R.54358].  Consistent with this position (which was expressly stated in Barclay's pre-Sale communications with the CFTC), in the months following the Sale, Barclays painstakingly identified all such liquidated *house* accounts for the Trustee's benefit, confirming that it was not claiming the assets in those accounts.  [Dkt. 51, Ex. 4; R.25195-221].  Barclays also introduced at trial a chart of *claimed* House ETD Accounts, and included on that chart only the house accounts it had determined were not yet liquidated by the time of the Sale.[9]  Notably, when the Trustee's attorney missed the

---

[9] [*Compare* Dkt. 51, Ex. 4 (Dep. Ex. 405A) *with* Bloomer Decl., Ex. 5 (Dep. Ex. 560) at E1; *see also* Dkt. 51, Ex. 3 (James Dep. Tr.) at 254:13-19 (confirming that Exhibit "E1" (the list of *claimed* house account margin) was

distinction Barclays had drawn between house and customer accounts, Barclays' ETD

representative clarified that Barclays was disclaiming only assets in *house* accounts that

contained no open positions.  [Dkt. 51, Ex. 3 at 255:13-21].[10]

The Trustee tries to blur the distinction between assets held in House ETD Accounts and

those held in Customer ETD Accounts by lumping them together as "Residual Cash" and

claiming Barclays "disavowed" them.  But each of the "disavowals" he cites was expressly

limited to margin in the *house* accounts liquidated before closing.  *See infra* at n.32.  Throughout

the trial, the Trustee *never* disputed Barclays' contention that *all* Customer ETD Accounts had

been transferred to Barclays, including those with no open positions, and he *never* presented an

alternative argument that, even if Barclays prevailed on its claim for Margin Assets in general,

the Trustee should nonetheless retain the Newly Disputed Customer Account Margin.

**E.     In Its Appeal Of The Bankruptcy Court's Order Denying Barclays The ETD Margin Assets, Barclays Continued To Claim All ETD Margin Assets, Including Those The Trustee Now Seeks To Exclude.**

After being denied all Margin Assets at trial, Barclays appealed that decision to this

Court, seeking to reverse the entirety of Judge Peck's decision.  Barclays' Statement Of Issues

On Appeal, filed with this Court on August 29, 2011, stated that the "Margin Assets" were "as

defined in the Appealed Orders," which in turn referred to the Bankruptcy Court's decision,

which defined the Margin Assets as "approximately $4 billion" held "in connection with

---

prepared by taking Deposition Ex. 405A (the list of *all* house accounts) "and removing the lines that had 'N' on them" (the N's indicating that there were no open positions))].

[10] Barclays' efforts to identify house accounts with no open positions were necessarily based on incomplete information, and the parties have since discovered that certain house accounts initially believed to contain open positions turned out not to contain any open positions.  [*See* Bloomer Decl. at ¶¶ 37-43].  Accordingly, Barclays does not seek the $181 million in so-called "Residual Cash" that represented unencumbered assets in *house* accounts that were fully liquidated before the Sale (which Barclays originally claimed only because it believed the associated accounts to contain open positions).  This has the net effect of reducing the amount of "Residual Cash" in dispute from $595 million to approximately $414 million.  This $414 million of so-called "Residual Cash" that remains in dispute *includes* the $150 million held by Macquarie Bank at the time of the Closing, which secured obligations relating to customer ETDs that were transferred to Barclays in the Sale.  [*See* Dkt. 51, Ex. 2])

16

derivatives trading," and consisting of "LBI property used to support trading conducted by LBI

on its own behalf *and on behalf of its customers and affiliates*."  [*See* Dkt. 3 at p. 2; Dkt. 1-1

(Appealed Orders defining Margin Assets as in the Bankruptcy Court's 2/22/11 Opinion);

R.66878 (Bankruptcy Court definition of Margin Assets) (emphasis added)].

The Trustee's appellate brief likewise confirmed that Barclays' appeal encompassed the

same universe of Margin Assets (of approximately $4 billion) that were in dispute at trial.  [*See,

e.g.*, Dkt. 24 at 6 (Issue presented on appeal: "Did the Bankruptcy Court commit clear error in

concluding that the Sale agreements did not convey to Barclays some $4 billion of Margin

Assets (consisting of cash and highly liquid government securities posted to support LBI's

derivatives trading activities)"); *id.* at 10-11 ("The Margin Assets consist of approximately $4

billion of LBI's cash and cash equivalents that LBI posted at clearing corporations, exchanges,

banks, and futures brokers to support its derivatives trading.") (citing the Bankruptcy Opinion);

*id.* at 21 ("The Bankruptcy Court awarded the Margin Assets to the Trustee.")].

Similarly, statements the Trustee made to the Second Circuit and in its Bankruptcy

Reports confirmed he understood the appeals to encompass the *very same assets* the Bankruptcy

Court denied Barclays.[11]  The Trustee never made any statement indicating he believed Barclays

had dropped its claim to any portion of the Margin Assets Barclays claimed at trial.

### F.   The $4 Billion Estimate At Trial And On Appeal Included The Majority Of The Assets The Trustee Now Seeks To Exclude.

The Trustee currently values the Newly Disputed Margin for Affiliate ETDs at $710

million and the Newly Disputed Customer Account Margin at $414 million (after excluding the

---

[11] [*See, e.g.*, CA2 ECF 101 at 4 ("Accordingly, the Bankruptcy Court ruled that it had not approved the Clarification Letter or the transfer of the Margin Assets.  The District Court *reversed and held just the opposite . . . .*") (emphasis added); *id.* at 2; *Compare* Bloomer Decl., Ex. 7 at ¶ 86 (the Bankruptcy Court "clarified that the Trustee is entitled to all of the Margin Assets") *with* Bloomer Decl., Ex. 8 at ¶ 54 (the District Court "reversed the Bankruptcy Court's judgment on the Margin Assets and held that Barclays is entitled to those assets.")].

assets in Liquidated House Accounts).  [*See* Dkt. 67 at 7, 9].  Contrary to the Trustee's

contention that these amounts were not claimed at trial and/or on appeal, the truth is that the

parties' original $4 billion estimate expressly included almost *all* of the Newly Disputed

Customer Account Margin and *$370 million* of the Newly Disputed Margin for Affiliate ETDs.[12]

      The table below lists what the Trustee is trying to claw back, by amount and ETD

account number.  Yellow highlights show each account Barclays knew about and expressly

claimed in its entirety at trial.  [Bloomer Decl. at ¶ 35].  The lines *not* highlighted represent ETD

accounts that are conceptually indistinguishable from the highlighted accounts, except that the

parties did not identify them until after the trial.  [*See* Bloomer Decl. at ¶¶ 13-34].

| Broker | Acct. Number | Newly Disputed Amount | Disputed Category |
|---|---|---|---|
| Kenanga | 02295566 | 7,561,143 | Affiliate ETD Margin |
| LBIE | 02295637 | 2,821,118 | Affiliate ETD Margin |
| LBIE | 02295586 | (2,432,532) | Affiliate ETD Margin |
| LBIE Seoul | 02295638 | 22,299,288 | Affiliate ETD Margin |
| LBJ | 02295614 | 8,858,050 | Affiliate ETD Margin |
| LBJ | 02295621 | 46,692,924 | Affiliate ETD Margin |
| LBSAL | 02295546 | (748,930) | Affiliate ETD Margin |
| MF Global | 02295409 | 45,168 | Affiliate ETD Margin |
| Newedge | 02295597 | 17,832 | Affiliate ETD Margin |
| BMO | 02295404 | 4,681,148 | Affiliate ETD Margin |
| LBIE | 02295630/1 | 262,563,978 | Affiliate ETD Margin |
| LBIE | 02295585 | 154,305,508 | Affiliate ETD Margin |
| LBIE Seoul | 02295636 | 46,397,649 | Affiliate ETD Margin |
| Macquarie | 02295605 | 52,410,344 | Affiliate ETD Margin |
| The Clearing Corp. | 835 | 7,900,000 | Affiliate ETD Margin |
| ICE | [unknown] | 4,000,000 | Affiliate ETD Margin |
| Polaris | 02295558 | 93,344,808 | Affiliate ETD Margin |
| Kenanga | 02295565 | 5,084,575 | Closed Position Margin |
| LBFA | 02295572 | 132,913,777 | Closed Position Margin |
| LBIE | 02295632 | (21,145,814) | Closed Position Margin |
| LBIE | 02295555 | 1,302,733 | Closed Position Margin |
| LBIE Seoul | 02295635 | 679,369 | Closed Position Margin |
| LB PTE | 02295612 | 139,039,681 | Closed Position Margin |

---

[12] Barclays did not become aware of the remaining Newly Disputed Margin for Affiliate ETDs until long after the trial.  [*See* Bloomer Decl. at ¶¶ 13-34].

| Broker | Acct. Number | Newly Disputed Amount | Disputed Category |
|---|---|---|---|
| LBSAL | 02295547 | 1,286,740 | Closed Position Margin |
| Samsung | 02295628 | 4,318,465 | Closed Position Margin |
| Macquarie | 02295605 | 150,000,000 | Closed Position Margin |
| Total Newly Disputed Margin (including all accounts) | | $1,124,197,022[13] | |
| Total Newly Disputed Margin in Accounts Expressly Claimed By Barclays At Trial And On Appeal | | $826,491,367[14] | |

Put simply, the parties' $4 billion estimate *included* most of the Newly Disputed Margin.

**G.    The Value Of The ETD Margin Assets Has Increased Only Because Of Asset Appreciation And Newly Identified Margin Assets, And The Trustee Concedes That These Additional Amounts Are Covered By The Judgment.**

The reason the current estimated value of the Margin Assets is more than "approximately $4 billion" is because, during the four plus years since trial, Barclays has learned that: (a) the securities pledged to the OCC as margin have appreciated in value by approximately $400 million; and (b) LBI's ETD Accounts contained approximately $1.15 billion more in Margin Assets than shown by the information previously disclosed to Barclays.  [*See* Bloomer Decl. at ¶¶ 13-34].  Barclays also learned that certain assets it was claiming were held in House ETD Accounts that were later determined to contain no open positions at the time of the Sale, and thus Barclays is no longer asserting a claim to those assets.  [*Id.* at ¶¶ 37-43].  This new information resulted in a net increase in the estimated value of the Margin Assets from "approximately $4 billion" to approximately $5.18 billion.  None of this information was known (at least to Barclays) when the parties arrived at their $4 billion estimate.  The Trustee concedes that the late

---

[13] The Trustee suggests there are $1.3 billion in assets in dispute.  However, he is including $181 million in Liquidated House Account assets that Barclays is not claiming (some of which Barclays originally claimed only because it mistakenly believed these accounts contained open positions, and the rest of which Barclays has never claimed).

[14] At the time Barclays formed its $4 billion estimate, the highlighted accounts were believed to contain approximately $725 million in what the Trustee now claims to be Newly Disputed Margin.  Barclays learned more recently that one of these accounts held more than originally estimated and that a second account, originally believed to contain a small positive value, actually carried a deficit balance.  [Bloomer Decl. at ¶ 36].

identification of these assets, and the new information concerning their status, does *not* negate Barclays' (or, in the case of liquidated house accounts, the Trustee's) entitlement to them.  *See id.* at ¶¶ 6-34.

As Barclays obtained new information concerning the value of the Margin Assets, it disclosed that information, and its impact on the magnitude of its claim, to the Trustee and the courts.  Thus, in July of 2012, after this Court's decision was issued on the appeal and after weeks of discussions with the Trustee during which some of this new information was first brought to Barclays' attention, Barclays and the Trustee jointly presented this Court with a proposed order that required the Trustee to establish a litigation reserve of $4.6 billion.  As the Trustee well knows, this figure encompassed $2.470 billion in *undelivered* Margin Assets (*on top of* the $2.054 billion in Margin Assets that Barclays had already received), bringing the total estimated value of Margin Assets to approximately **$4.5 billion**.  [*See* Dkt. 42 (D. Ct. J.) at ¶ 5; see Bloomer Decl. at ¶¶ 3-7].  Less than a year later, on April 15, 2013, the parties *jointly* submitted—and the Bankruptcy Court entered—an order that required the Trustee to increase the reserve from $4.6 billion to $5.462 billion to account for the rest of the newly identified Margin Assets in LBI's ETD accounts, thus bringing the total estimated value of the claimed Margin Assets to approximately **$5.3 billion** (which estimate subsequently decreased as additional liquidated house accounts were identified).  [*See* Bloomer Decl., Ex. 2; *id.* at ¶¶ 6-34].  The Trustee agreed to reserve for this amount even though he now claims Barclays waived its claim to $1.3 billion of that amount.

The Trustee concedes that the majority of the newly identified Margin Assets are "*covered by the Judgment*" and are not in the disputed categories addressed in the Trustee's motion.  Specifically, he concedes that the appreciation on the OCC securities is covered by the

Judgment; he *concedes* that over $80 million in newly identified assets recovered from other domestic ETD exchanges are covered by the Judgment, and he concedes that $440 million in newly identified assets at LBIE[15] *are covered by the Judgment*.[16]

**ARGUMENT**

## I.  THE JUDGMENT ENTITLES BARCLAYS TO ALL OF THE MARGIN ASSETS IT HAS CONSISTENTLY CLAIMED, WHICH INCLUDES THOSE THE TRUSTEE NOW SEEKS TO EXCLUDE.

In its motion to enforce the Purchase Agreement and the Sale Order (decided by the Bankruptcy Court), Barclays sought a specific performance order that would require the Trustee to deliver "all property used to secure obligations under any and all exchange-traded derivatives."  [R.60603, 60606 (Proposed Order)].  Barclays did not seek a specific value, but instead sought "any and all" Margin Assets.  The Margin Assets were estimated at trial to be worth approximately $4 billion based on the information and valuations available at that time.  This $4 billion estimate included both categories of Newly Disputed Margin the Trustee seeks to claw back from this Court's Judgment.  *See* SOF §§ D and F.

After being denied *all* Margin Assets at trial, Barclays appealed to this Court.  Barclays' Statement of Issues On Appeal made clear that its appeal encompassed the entirety of the "Margin Assets" the Bankruptcy Court had denied it.  [*See* Dkt. 3  at p. 2].  Specifically, it adopted the *Bankruptcy Court's definition* of the Margin Assets Barclays had claimed at trial, and its briefs expressly and repeatedly referenced *the same approximation of $4 billion* to refer

---

[15] The Trustee claims that approximately $440 million of the assets "covered by the Judgment" are still "held by LBI's European affiliate" —LBIE—and that Barclays must therefore pursue those assets against LBIE (in administration).  [Dkt. 67 at 4].  Barclays disagrees with this, since the Trustee has effectively recovered the Margin Assets that were held by LBIE (including not just this $440 million but also additional Newly Disputed Margin) in connection with an LBI-LBIE settlement that was reached earlier this year.  Barclays is currently in discussions with the Trustee and LBIE to resolve this dispute; rather than address this issue here, Barclays reserves its rights to raise this argument at a later date if no resolution is reached.

[16] [*See* Dkt. 67 at 23 n.7 (conceding that Barclays is entitled to all Margin Assets at the OCC); *id.* at 4, n.1 (conceding Barclays is entitled to $440 million of Margin Assets at LBIE); Bloomer Decl. at ¶¶ 6-34].

to the universe of all Margin Assets.[17]  With one exception not relevant here,[18] this Court's Judgment *granted Barclays' Margin Assets appeal in its entirety*, and ordered the Bankruptcy Court to "GRANT" the Barclays motion seeking "any and all" Margin Assets.  Under the Judgment, Barclays is entitled to all of the Margin Assets it claimed at trial.  Indeed, this Court's Amended Opinion expressly confirmed that the assets subject to this Judgment were the very same assets that were the subject of Barclays' claim at trial.  [*See* Dkt. 41 at 7, n.5 ("The [Bankruptcy Court] Decision identifies the Margin Assets as '$4 billion in cash and cash equivalents held at the OCC, other clearing corporations and exchanges, certain banks, and certain foreign futures brokers in connection with derivatives trading.' . . . The amount in dispute on Barclays' appeal before this Court is *the full $4 billion* . . . .") (emphasis added); *id.* at 50 ("Accordingly, the decision of the Bankruptcy Court with respect to the Margin Assets is reversed….")].  As shown above, the change in estimated value of the Margin Assets (from $4 billion to $5.18 billion) reflects appreciation in previously-agreed categories of Margin Assets plus the identification of Margin Assets of the same types as were claimed at trial; it does not represent any new margin categories or any new claims.

The fact that Barclays (along with the Trustee, this Court, and the Second Circuit)[19] used different language at different times to describe the relevant assets is legally and factually irrelevant—it was clear that the parties and courts were all taking about the entirety of the Margin Assets Barclays sought at trial.  *See Chase Manhattan Bank v. Am. Nat'l Bank and Trust*

---

[17] [*See* Dkt. 16 at 3-4 ("The Bankruptcy Court not only upheld the Trustee's claim that it did not have to deliver approximately $2 billion in undelivered ETD margin collateral, it also held that Barclays was required to return approximately $2 billion of margin collateral that had already been voluntarily delivered by the Trustee pursuant to everyone's understanding that Barclays was entitled to it.") (excerpt from Barclays opening brief to this Court)].

[18] The Trustee did argue that, even if Barclays was entitled to proprietary margin, Barclays was not entitled to $507 million at the OCC that was used as a debit item in LBI's Rule 15c3-3 reserve calculation.  The Trustee withdrew this argument during the pendency of his Second Circuit appeal.  [CA2 ECF 290 at 14, n.4].

[19] [*Compare* Dkt. 41 at 2 *with id.* at 8; *compare* CA2 ECF 290 at 3 *with id.* at 11].

*Co. of Chicago*, 93 F.3d 1064, 1072 (2d Cir. 1996) (no waiver where a party makes the "same argument, albeit in different terms" as made at trial).

The Trustee seizes upon Barclays' reference to "LBI proprietary assets held to secure the ETDs that were transferred to Barclays in the Sale."  But that description is accurate and consistent with the description of Margin Assets used in the Bankruptcy Court, and in no way constitutes a waiver of any portion of Barclays' longstanding claim to all Margin Assets.  *First*, Barclays' Statement of Issues on Appeal clearly included all Margin Assets sought by Barclays at trial, which included both currently disputed categories.  *Second*, in conjunction with saying that Barclays was entitled to the assets that secured ETDs that were "transferred to Barclays in the Sale," Barclays explained that "LBI <u>transferred</u> to Barclays *all* of its exchange-traded derivative positions," thus making clear that no ETDs were intended to be carved out of that definition.  [Dkt. 16 at 10].  *Third*, the actual trial record *shows* that affiliate-owned ETDs were transferred to Barclays in the Sale, as were all of LBI's Customer ETD Accounts, including those with "no open commodities positions" (and that even though some customer ETD positions were closed out, the margin in those accounts was still there to secure the obligations under those ETDs, which continued to exist).  *Fourth*, although the Trustee cherry picks what it views as a narrower description, other descriptions in that same brief clearly encompassed both newly disputed categories.[20]  Thus, far from reflecting an intentional relinquishment of Barclays' position or "waiver" of Barclays' claim to the Margin the Trustee now tries to claw back, Barclays continued to claim the entire universe of Margin Assets (i.e., the full universe approximated at $4 billion), including the subsets the Trustee now disputes for the first time.

---

[20] For example, Barclays made clear in its opening brief that the "The Margin Assets at issue consist of proprietary LBI assets (i.e., assets owned by LBI) that were held in LBI's various ETD accounts to secure its ETD obligations." [Dkt. 16 at 11].  As noted above, these "obligations" included settlement obligations for affiliate-owned ETDs as well as ongoing obligations that survived the close-out of customer ETD positions.

In sum, Barclays *claimed* the Newly Disputed Margin at trial, Barclays *appealed* the Bankruptcy Court's denial of those assets across the board, and this Court *reversed* the Bankruptcy Court's decision, holding that Barclays was entitled to all of the Margin Assets claimed at trial, and the Second Circuit affirmed that ruling. Thus, the governing Judgment encompasses both categories of Newly Disputed Margin.[21]

## II.   THE TRUSTEE IS LEGALLY BARRED FROM CONTESTING BARCLAYS' ENTITLEMENT TO THE NEWLY DISPUTED MARGIN.

### A.   The Second Circuit's Mandate Awards All ETD Margin Assets To Barclays, And Precludes The Relief Sought By The Trustee.

This Court is not free to deviate from the Second Circuit's ruling.  The mandate rule "forecloses relitigation of issues expressly or impliedly decided by the appellate court." *United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001).  "In other words, the trial court is barred from reconsidering or modifying any of its prior decisions that have been ruled on by the court of appeals." *Burrell v. United States*, 467 F.3d 160, 165 (2d Cir. 2006).  Any decision by this Court "should not be inconsistent with either the express terms or the spirit of the mandate." *In re Ivan F. Boesky Sec. Litig.*, 957 F.2d 65, 69 (2d Cir. 2002).

While the Trustee attempts to narrow the Second Circuit's ruling awarding Margin Assets to Barclays through selective quoting, that holding is broad and encompasses the Newly Disputed Margin.  *First*, the Second Circuit expressly defined the "Margin Assets" broadly as

---

[21] There are additional reasons why Barclays is entitled to all of the Margin Assets that were held in "mixed accounts" in particular—those that held both LBI proprietary ETDs and affiliate-owned ETDs.  *First*, the proprietary margin assets in those accounts were not earmarked for one or the other type of ETD; rather, they secured *all* ETDs in those accounts.  [*See* R.58051].  Thus, all of the assets in those accounts constitute "Margin Assets"—assets that secured the LBI proprietary ETDs that were "transferred to Barclays in the Sale," even if they also secured affiliate-owned ETDs—and all of them are covered by the Judgment.  The Trustee's allocation of some of that margin *exclusively* to affiliate-owned ETDs is an *ex post* mathematical exercise done solely for his motion (Barclays reserves the right to challenge those allocations if ever relevant, which they should not be).  *Second*, Barclays bore the costs of closing out the affiliate-owned ETDs in the mixed accounts.  [R.3699 at ¶8].  To give back to the Trustee the Margin that was used to cover the expense of liquidating the ETDs would contradict the decisions of this Court and the Second Circuit.  [*See* CA2 ECF 290 at 17; *id.* at 16; Dkt. 41 at 32].

"cash and cash equivalents held by third parties to secure LBI's exchange-traded derivatives ("ETDs") *business*." [CA2 ECF at 3 (emphasis added); *id.* ("It is undisputed that Barclays purchased LBI's ETD business.  The dispute is over whether the Margin Assets supporting the ETD business . . . were transferred along with the ETD business by operation of the various documents at issue.")].  *Second*, the Second Circuit found that the Margin Assets were conveyed to Barclays not just by the parenthetical in the Clarification Letter but by the broader language of the APA—as assets that were "used in connection with the Business" and within the scope of the seller warranty stating that "all of the necessary assets and services used by the Seller and its Affiliates to operate the Business as it is currently operated."  [*Id.* at 14; *see also id.* at 15]. Therefore, even if the Newly Disputed Margin was not encompassed by the Clarification Letter parenthetical (as the Trustee argues, wrongly), they are still assets used in connection with and necessary for the ETD business that was bought by Barclays—and therefore within the scope of the Second Circuit's mandate awarding such assets to Barclays.

Additionally, the mandate rule forecloses consideration of issues that *could have been raised* but were not.  *United States v. Vidal*, 136 F. App'x 438, 439-40 (2d Cir. 2005).  Thus, this Court may not deviate from the mandate of the Second Circuit "on the basis of matters included *or includeable*" in the prior appeal.  *Seese v. Volkswagenwerk, A.G.*, 679 F.2d 336, 337 (3d Cir. 1982) (emphasis added).  As explained above, Barclays' Margin Assets claim at trial and on appeal before this Court encompassed both categories of Margin the Trustee now seeks to exclude from the Judgment.  Thus, any argument the Trustee has for why those two categories of Margin should not have been awarded to Barclays in the Judgment were "includeable" in the Trustee's appeal to the Second Circuit.  For this reason, the mandate rule forecloses any consideration of them now.  *United States v. Vidal*, 136 F. App'x 438, 439-40 (2d Cir. 2005).

25

**B.      The Trustee Waived These New Arguments.**

It is black-letter law that alternative arguments cannot be asserted for the first time after trial or on appeal.  *See, e.g., AUSA Life Ins. Co. v. Ernst & Young*, 119 F. Supp. 2d 386, 392 (S.D.N.Y. 2000) (denying ability to assert new claim for relief when not raised until post-trial submissions); *Recinos Villanueva v. Holder*, 474 F. App'x 28 (2d Cir. 2012) (party must "clearly indicate" they are raising an argument to preserve it).  This prohibition is particularly important where the failure to raise an alternative argument was a strategic decision.  *See Air Et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 493 (2d Cir. 1985) (finding waiver where party "was represented by competent counsel who took a calculated risk in not presenting an alternative interpretation of his client's case").  Moreover, an issue is not sufficiently "raised" by a party's mention of it in a "passing" or "casual reference," or in a footnote.  *Norton v. Sam's Club*, 145 F.3d 114, 117-18 (2d Cir. 1998).  To the contrary, in order to be raised (and preserved), an issue must be "articulate[d] to the trial court with sufficient distinctness to alert the court to the nature of the claimed defect."  *United States v. Dorvee*, 616 F.3d 174, 179 (2d Cir. 2010).  Finally, the party asserting such an alternative argument must call the court's attention to any proof in support of that argument.  *See Diesel v. Town of Lewisboro*, 232 F.3d 92, 105 n.7 (2d Cir. 2000).

As shown above, Barclays sought both categories of Newly Disputed Margin at trial.  *See* SOF §§ D and F.  The Trustee made a strategic decision at trial to make the broad argument that the Purchase Agreement did not transfer *any* Margin Assets to Barclays, and made only a single alternative argument—i.e., that even if Barclays was entitled to all other Margin Assets, it was not entitled to the $507 million subset of Margin Assets held in an OCC customer account that was used as a debit item in LBI's customer reserve calculation.  By doing so, he waived the two alternative arguments he seeks to make now.  *See In re Rezulin Prods. Liability Litig.*, 224 F.R.D. 346, 352 (S.D.N.Y. 2004) ("It would be inappropriate to permit litigants to take it upon

themselves to litigate issues in whatever piecemeal fashion they wish, trying out one argument and then, if unsuccessful, starting all over again with a new one.").

The Trustee's passing reference in a bankruptcy reply brief to the fact that affiliate-owned ETDs were not "acquired" by Barclays[22] is both insufficient as a matter of law, *see Norton*, 145 F.3d at 117-18, and irrelevant as a matter of fact.  Simply put, the point raised in this passing reference (that Barclays did not "*acquire*" the affiliate-owned ETDs) is not the point the Trustee now makes (that the affiliate-owned ETDs outside the OCC were not *transferred* to Barclays in the Sale, and thus the assets securing them constituted "free cash").  *See Sompo Japan Ins. Co. of America v. Norfolk S. Ry. Co.*, 762 F.3d 165, 189 (2d Cir. 2014) (argument "not properly preserved" where the prior arguments were "meaningfully different").  That Barclays did not acquire the affiliate-owned ETDs, just as it did not "acquire" the ETDs in the Customer ETD Accounts, was never in dispute, nor is it relevant.  What matters is that LBI transferred its responsibilities for both affiliate and customer ETDs to Barclays, and that margin assets securing the affiliate ETDs was LBI-owned assets used in LBI's ETD Business (making them Purchased Assets under the Purchase Agreement).

Not only did the Trustee waive his newly raised arguments by opting not to present them at trial, he waived them again when he opted not to present them to this Court or the Second Circuit.  Whereas Barclays asserted its right to the Newly Disputed Margin both at trial and throughout the appeal, the Trustee never once articulated an argument to this Court or the Second Circuit that, even if Barclays is generally entitled to the Margin Assets, it should not be entitled to the two categories the Trustee now tries to claw back.  The Trustee therefore waived these

---

[22] The Trustee cites a footnote he included in one bankruptcy court brief where he stated in passing that "Barclays also seeks hundreds of millions of dollars in Margin Assets that LBI posted at foreign exchanges with respect to affiliates' derivatives that Barclays did not even *acquire*" [Dkt. 67 at 10 (emphasis added)].  He then uses ellipses to make it appear—inaccurately—that the bankruptcy court specifically and separately addressed the Newly Disputed Margin for Affiliate ETDs issue now raised by the Trustee.  [*Id.* at 18).

"alternative grounds" for denying Barclays the Newly Disputed Margin. *Parmalat Cap. Fin. Ltd. v. Bank of America Corp.*, 671 F.3d 261, 270-71 (2d Cir. 2012). The law does not permit the Trustee to hold these arguments in his pocket *until after he has lost twice on appeal*, only to raise them for the first time five years after Barclays first claimed these assets. *Id.* ("It is not reasonable to construe the mandate as allowing alternative, dispositive bases for denying [relief] to be raised for the first time on remand, particularly when the cases had been pending for years and had already been the subject of an appeal.").

## III.   IF THIS COURT REACHES THE MERITS OF THE TRUSTEE'S NEW ARGUMENTS, THE RECORD MANDATES JUDGMENT FOR BARCLAYS.

The Court should deny the Trustee's motion without reference to any extra-record facts since it is barred by the mandate rule and the Trustee's waiver. Nevertheless, if the Court chooses to address the merits of the Trustee's new arguments, it should reject them as meritless.

### A.   The Purchase Agreement Entitles Barclays To All Affiliate ETD Margin, Including The Newly Disputed Margin For Affiliate ETDs.

The Trustee claims that Barclays is not entitled to the Newly Disputed Margin for Affiliate ETDs under the Purchase Agreement. This claim hinges on the single, false assertion that the affiliate-owned ETDs outside the OCC "were not transferred to Barclays in the Sale" and therefore the LBI Margin Assets securing them were not "Purchased Assets." However, the affiliate-owned ETDs (at the OCC and elsewhere) *were* transferred to Barclays in the Sale, and as this Court has already held, for this reason, Barclays is entitled under the Purchase Agreement to the Margin Assets that secured them. [Dkt. 41 at 2, 50].

The Trustee's sole support for his assertion that the affiliate-owned ETDs were not transferred to Barclays is contained in the following two sentence paragraph in his brief:

"Nor were the Affiliate Derivatives transferred to Barclays to hold on behalf of LBI's affiliates. Paragraph 8 of the Clarification Letter provides that "[a]ll customer accounts of LBI (*other than customer[s] who are Affiliates of LBI*) shall

28

be transferred to [Barclays]."  (R. at 64 [Clarification Letter ¶ 8] (emphasis added).)

[Dkt. 67 at 20].  This provision addresses LBI's accounts with its customers and provides that Barclays was to receive, in connection with the transfer of those accounts, all associated customer property.[23]  The exclusion of "customers who are affiliates of LBI" signified that Barclays was not taking on the affiliates' customer accounts at LBI.  Paragraph 8 had nothing to do with *LBI's* liabilities *to the ETD exchanges and brokers* for affiliate-owned ETDs carried with those exchanges and brokers; as shown above, LBI had no choice but to move the clearing organization relationships *in bulk* over to Barclays.  *See* SOF § C.  The parties' agreement concerning ETDs was addressed in other provisions of the Purchase Agreement, such as those pursuant to which LBI transferred to Barclays the entirety of its ETD Business and all of the assets associated with that Business.[24]  The Trustee's interpretation of Paragraph 8 would impermissibly bring it into direct conflict with these other provisions that specifically address LBI's ETD Business.  *See, e.g., Trans Pac. Leasing Corp. v. Aero Micronesia, Inc.*, 26 F. Supp. 2d 698, 709 (S.D.N.Y. 1998) (it is an "important principle[] of contractual interpretation" that, "in case of conflict . . . specific words and clauses control the general").  Such conflict-creating interpretations are particularly inappropriate where, as here, those provisions can be

---

[23] As the Second Circuit noted, Barclays took responsibility for "72,000 customer accounts" at LBI.  [CA2 ECF 290 at 6.]  These "customer accounts" would reflect all sorts of trading and other services that LBI performed on behalf of its customers (i.e., "investment banking, capital markets, fixed income and equities cash trading," etc. [R.6]).

[24] [R.10 (Purchased Assets include "exchange-traded derivatives"); R.61 (Purchased Assets defined as "all of the assets of Seller used primarily in the Business or necessary for the operation of the Business"); R.23 (LBI warranted that Purchased Assets include "*all of the necessary assets and services used by Seller and its Affiliates to operate the Business as it is currently operated*"); R.15-16 (Barclays' assumption of LBI's liabilities associated with the ETD Business).  Barclays' assumption of LBI's relationships with its ETD exchanges and brokers was not only confirmed in the Purchase Agreement itself, but also in the CFTC bulk transfer order, [R.54355-68; R.54369-73], and by Barclays' Purchased Contracts designations, [R.26113 at n.1 (designating, as Purchased Contracts, "any and all exchange-traded derivatives (as such term is used in the Purchase Agreement) in existence as of September 22, 2008 having LBI as a party, including, without limitation, those . . . between LBI and the counterparties listed on Exhibit A (such contracts, the 'Purchased Contracts'")); *id.* at Exhibit A (listing, among others, the OCC, ICE, and all then-known foreign ETD exchanges, including those in Japan, Hong Kong, Kora, Malaysia, Australia, and Singapore)].

harmonized.[25]  Here, Paragraph 8 governed the transfer of the accounts of LBI's customers (but not its affiliated customers) and all *customer* property associated with those accounts; by contrast, the ETD-related provisions governed the transfer of LBI's ETD Accounts with clearing organizations—and all proprietary assets associated with the ETDs—to Barclays.  *Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 445 (S.D.N.Y. 2003) (courts "cannot and should not accept an interpretation that ignores the interplay of the terms, renders certain terms inoperable, and creates a conflict where one need not exist.").

The Trustee's proffered interpretation of Paragraph 8 would also bring it into conflict with the Transfer and Assumption Agreement ("TAA").  [R.52-55].  Although the Trustee suggests that affiliate-owned ETDs were carved out of the ETD account transfer by virtue of Paragraph 8 of the Clarification Letter, he simultaneously concedes that affiliate-owned ETDs at the OCC *were* transferred to Barclays.  [Dkt. 67 at 23 n.7].  The Trustee cannot credibly claim that the TAA is what placed the OCC ETDs on different footing, since he already argued so vigorously that the TAA could not "materially change the [Purchase Agreement's] terms" because it "never was presented to the Court."  [*See* R.64584-86 (Trustee 11/22/10 Post-Trial Brief); Dkt. 23 at 39].[26]  Indeed, this Court has already recognized that the TAA was intended "to *implement* the transaction contemplated by the Purchase Agreement"—not to alter it.  [Dkt. 41 at 47-48 (emphasis added)].  Finally, there is no contractual provision or other evidence suggesting that the parties intended to treat the affiliate-owned ETDs at the OCC differently from affiliate-owned ETDs at other clearing organizations.  To the contrary, the TAA—which came about

---

[25] *James v. Jamie Towers Hous. Co.*, 743 N.Y.S.2d 85, 88 (N.Y. App. Div. 2002) ("where two seemingly conflicting contract provisions reasonably can be reconciled, we are required to do so and to give both effect").

[26] The Trustee's suggestion that the TAA was an entirely "separate agreement" that was "separately negotiated," cannot be squared with this Court's prior holding that the TAA was intended "to implement the transactions contemplated by the Purchase Agreement."  [Dkt. 41 at 47-48].

because the OCC showed up at the Sale Hearing and asked the parties to spell out their arrangement (as it affected the OCC) in more specific terms, [R.2563-65; R.2636; R.2866; R.2943]—only confirms the parties' agreement with respect to all ETDs in LBI's ETD Accounts, including affiliate-owned ETDs at the OCC and elsewhere.

The Trustee's interpretation of Paragraph 8 also conflicts with the unrebutted evidence (explained in the fact section, above) that LBI's clearing organizations were not willing to allow LBI to carry on as a clearing member for *any* ETDs after it went into liquidation; instead they demanded that Barclays step into LBI's shoes and threatened to liquidate LBI's accounts if Barclays did not do so. *See* SOF § C. For that reason, the CFTC approved a bulk transfer of all of LBI's ETD Accounts to Barclays, which were renamed in Barclays name *at the express direction of the Trustee*. *See* SOF § B. Then, Barclays—not the Trustee—closed out the affiliate-owned positions. *Id.* Thus, all the affiliate-owned ETDs *actually were* transferred to Barclays, and the Trustee's suggestion that the affiliate-owned ETDs outside the OCC were treated differently from any other ETDs in LBI's accounts is wholly unsupported. *Gulf Ins. Co. v. Transatlantic Reins. Co.*, 886 N.Y.S.2d 113, 143 (N.Y. App. Div. 2009) ("the parties' course of performance under the contract is considered to be one of the most persuasive evidence of the agreed intention of the parties"); *N.Y. Marine and Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 119 (2d Cir. 2010) ("there is no surer way to find out the intent of the parties to a contract than to see what they have done"); *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 429 (2d Cir. 1992) (where a contract is ambiguous, "extrinsic evidence may properly be considered in the search for the contracting parties' intent.").

As shown above, the factual predicate of the Trustee's argument—that affiliate-owned ETDs were not transferred to Barclays in the Sale—is false. Thus, his argument fails. *See* Dkt.

41 at 2, 50 (Barclays is entitled to all LBI proprietary assets held to secure obligations under

ETDs that were "transferred to Barclays in the Sale").  His remaining arguments are red herrings.

It is irrelevant that Barclays did not "acquire" the affiliate-owned ETDs (just as it is irrelevant

that Barclays did not "acquire" customer ETDs).  It is irrelevant that cash and cash equivalents

were Excluded Assets (as the Trustee concedes, there is an exception for assets "held to secure

obligations under" exchange traded derivatives "that were transferred to Barclays in the Sale,"

*see* Dkt. 67 at 22).  It is irrelevant that the Purchased Assets provision carved out "assets set

aside . . . for the purpose of satisfying Excluded Liabilities" (because the Newly Disputed

Margin for Affiliate ETDs consisted of proprietary assets set aside to satisfy liabilities to clearing

organizations that were transferred to Barclays in the Sale—not liabilities to LBI's affiliates).[27]

*See* R.58051 (the margin in LBI's ETD Accounts secured LBI's liabilities to the exchanges and

was accessible to them, and only them, for that purpose).  It is irrelevant that affiliates may have

deposited margin with LBI in relation to their ETD trading (because it is undisputed that *all* of

the Affiliate ETD Margin consists of *LBI proprietary assets*, not affiliate-owned assets).[28]  [Dkt.

---

[27] The Trustee claims that Barclays' disclaimer of responsibility for an approximately $748,581 (USD) balance owed to LBSAL reflects a broader disclaimer of all "liabilities arising out of the Affiliate Derivatives."  [Dkt. 67 at 23].  That is false.  This disclaimer was not based on the fact that these liabilities arose out of affiliate-owned ETDs; it was because Barclays believed this account to qualify as a *house* account with *no open positions* at the time of the Sale.  [*See* Bloomer Decl. at ¶¶ 37-43].

[28] In addition, contrary to the assertions of "amicus" Lehman Brothers Holding Inc. ("LBHI") (which is really just a self-interested creditor), there is nothing inequitable about leaving the Trustee to answer for the so-called $3 billion in "affiliate claims."  *First*, the Trustee *concedes* that affiliate-owned ETDs at the OCC were properly transferred to Barclays (along with the proprietary assets securing them), even though the Trustee retained any associated liabilities to its affiliates for their OCC trading, thereby confirming that such an arrangement was not viewed by the Trustee as inequitable at all.  *Second*, a significant portion of these claims related to affiliate-owned ETDs that were held in house accounts that were liquidated prior to the Sale, including those liquidated in connection with a pre-Closing account liquidation at the CME (by far the largest futures clearinghouse in the United States), which cost the Trustee $1.6 billion in posted margin.  [R.1594, 1639].  Barclays is not claiming any assets associated with this liquidated CME account or with any other Liquidated House Accounts, and so the Newly Disputed Affiliate ETD Margin has nothing to do with that substantial portion of the affiliate claims.  *Third*, if the Trustee had tried to retain the affiliate-owned ETDs, rather than transfer them (and the assets securing them) to Barclays, the Trustee had every reason to believe the exchanges and brokers would have done precisely what the CME did—liquidate the positions and seize the margin securing them, leaving nothing for the Trustee to use to satisfy these affiliate claims in any event.  [R.1594, R.1639 (noting the massive losses resulting from the CME liquidation as a testament to the fact that

67 at 10; R.64546 (all Margin Assets in dispute at trial "consist of <u>LBI property</u>" (emphasis in original)].  And, finally, it is the *Trustee's* position, not Barclays', that conflicts with the previous Court findings that it would not have been rational to separate the collateral from the ETDs and related liabilities it secured.

> ### B.    Barclays Is Entitled Under The Purchase Agreement To All Customer ETD Account Margin, Including The Newly Disputed Customer Account Margin.

The Parties agreed in the Purchase Agreement that Barclays was to acquire the entirety of LBI's ETD business and "all of the assets of the Seller used primarily in" that business, including, without limitation, "exchange traded derivatives (and any property that may be held to secure obligations under such derivatives)."  As the Second Circuit has already confirmed, these provisions entitled Barclays to all of the assets "maintained by LBI in accounts at various financial institutions as collateral in connection with its exchange-traded derivatives ("ETD") business."  [CA2 ECF 290 at 11].

The assets in LBI's Customer ETD Accounts secured all of LBI's customer-related ETD obligations, and Barclays assumed those obligations, and acquired any property that may be held to secure those obligations, in the Sale.  *See* SOF §§ B-C.  The assumption of those liabilities came with significant risks, many of which related in no way to the existence of open positions in a particular account.  *See* SOF at § C.  Barclays had no ability, prior to the closing, to quantify or even estimate the amount of risk it was assuming in connection with LBI's customer ETD business, because LBI "had no idea" what assets and liabilities there were.  *See* SOF at § C.

The Purchase Agreement's exclusion of "Cash and Cash Equivalents" did not apply to the assets held in Customer ETD Accounts that contained "no open commodities positions."  As

---

"This administration is finished if this transaction is not completed, Your Honor."); R.58473-74; R.2866; R.2943; R.57744-45; R.58054-55, 58057-60; R.56644; R.24841 at ¶ 73, R.24872-73].

an initial matter, "cash," as the Second Circuit has held, means "money ready for use" as opposed to money that is "encumbered and not ready for use." [CA2 ECF 290 at 15]. The assets held in LBI's Customer ETD Accounts were held to secure LBI's liabilities to the ETD clearing organizations though which LBI traded, and also provided the means to satisfy LBI's ETD-related liabilities to its customers. [R.57733, 57736-37, 57742, 57744; R.58052]. As explained above, *see* SOF § C, the close-out of the customer ETDs did not terminate either of these types of liabilities, and thus the Newly Disputed Customer Account Margin was "encumbered" by these obligations; it was *not* "money ready for use," and thus, the exclusion for "Cash and Cash Equivalents" did not apply. The Second Circuit expressly held that the Purchase Agreement's "provisions clearly distinguish the Margin Assets from pure 'cash.'" [CA2 ECF 290 at 17]. Moreover, even if the term "cash" did encompass margin, the cash exclusion provision carved out assets "otherwise specified in the definition of Purchased Assets," [R.62], and all of the assets in LBI's Customer ETD Accounts were so specified because they constituted assets "necessary to the operation of" the ETD "Business"[29] and "property that may be held to secure obligations under" exchange-traded derivatives." [R.61-62.][30]

If this Court finds any ambiguity in the Purchase Agreement concerning whether the parties intended to exclude cash in LBI's Customer ETD Accounts that contained "no open commodities positions," the record evidence squarely refutes the Trustee's proffered interpretation. *First*, Lehman's own lead attorney in the Sale confirmed that the cash exclusions

---

[29] As the Second Circuit noted, the Trustee represented and warranted in the APA that "[t]he Purchased Assets, together with all of Seller's agreements hereunder and under the Seller Documents, constitute *all of the necessary assets and services used by Seller and its Affiliates to operate the Business as it is currently operated*." [R.23 (emphasis added); CA2 ECF 290 at 12-15]. The was *not limited by the cash exclusion provision*. [*Id.* at 15].

[30] The fact that a customer ETD position may have been closed out before LBI's Customer ETD Accounts were transferred to Barclays did not terminate the *obligations under those ETDs* (which included obligations to the clearing organizations for any resulting deficits in those accounts and obligations to LBI's customers associated with those ETDs). [R.57736-37; Bloomer Decl., Ex. 4 at 146:12-148:19]. Those *obligations* were transferred to Barclays in the Sale, as were the LBI proprietary assets held to secure those obligations. [R.61-62].

applied only to "free cash, unencumbered cash"—not to "margin cash associated with the customer's account"—and that all of the assets held in all of Lehman's Customer ETD Accounts—customer and proprietary assets alike—were being transferred to Barclays. [R.56172-73].  *Second*, if the Trustee truly believed that LBI's Customer ETD Accounts that contained "no open commodities positions" were not being transferred to Barclays, it was incumbent on him to inform Barclays of that before the Closing, when he learned that Barclays and the CFTC specifically understood the APA to transfer LBI's Customer ETD Accounts "that contain no open commodities positions" to Barclays.  [R.54358; R.54371].  Because the Trustee never even hinted that he had a different view of the APA's meaning at that time, basic principles of contract law preclude him from asserting a contrary interpretation for the first time now.[31]

Finally, Barclays *never* disavowed assets in LBI's *Customer* ETD Accounts that held no open positions at the time of the Sale.  The only assets Barclays ever disclaimed were assets held in *house* ETD accounts that contained no open positions at the time of the Sale, and every one of the assertions referenced in the Trustee's Motion was limited to *house* accounts.[32]

---

[31] *See U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 875 F.2d 1044 (2d Cir. 1989) (where one party had reason to know of other party's interpretation of a contract prior to its execution, a contract is to be interpreted consistent with that expressed interpretation); *People v. Houston*, 424 N.Y.S.2d 726, 734 (N.Y. App. Div. 1980) ("a promise is to be interpreted in that sense in which the promisor knew or had reason to believe that the promisee understood it").

[32] [*See* R. at 50415 n.1 (specifically addressing the LBI "*house*" accounts); R. at 25195 (attaching a file entitled "Lehman Brothers Inc. **Proprietary** Futures" that included only **house** accounts); Dkt. 51 Ex. 3 (noting that Barclays' disavowal of accounts that did not include any open positions applied only "*For the **proprietary** business*"); Dkt. 51, Ex. 4 (chart entitled "Lehman Brothers Inc. **Proprietary** Futures Collateral Positions as of Acquisition 9/22/08"); Dkt. 51, Ex. 5 (testimony regarding a list of **house** accounts, where "[t]he ones with the N we've not claimed" because they contained no open positions); *compare* Dkt. 51, Exs. 3, 4 and 5 *with* Bloomer Decl., Exs. 5 and 6 and R.3706 (the list of *all* Customer ETD Accounts was identical to the list of *claimed* Customer ETD Accounts, with no similar "N/Y" exercise having been performed)].

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

By: /s/ Jonathan D. Schiller
    Jonathan D. Schiller
    Jack G. Stern
    575 Lexington Avenue
    New York, New York  10022
    Tel:  (212) 446-2300
    Fax:  (212) 446-2350
    Email:  JSchller @bsfllp.com
          JStern@bsfllp.com

    Hamish P. M. Hume
    Jonathan M. Shaw
    5301 Wisconsin Avenue, N.W.
    Washington, D.C. 20015
    Tel:  (202) 237-2727
    Fax:  (202) 237-6131

    Email:  HHume@bsfllp.com
          JShaw@bsfllp.com

    *Attorneys for Barclays Capital Inc. and*
    *Barclays Bank PLC*

Dated:  New York, New York
        November 21, 2014