USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: April 22, 2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                                                        :

In re: LEHMAN BROTHERS INC.,                :

        Debtor.                                      :
------------------------------------------------------------------ X
                                                        :

BARCLAYS CAPITAL INC. and BARCLAYS    :
BANK PLC,                                        :        11 Civ. 6052 (KBF)
                                                        :        11 Civ. 6053 (KBF)
    Appellant and Cross-Appellees,               :
                                                        :        OPINION & ORDER
                            -v-                                    :
                                                        :
JAMES W. GIDDENS, as TRUSTEE for the    :
SIPA LIQUIDATION of LEHMAN BROTHERS  :
INC.,                                           :
                                                        :
    Appellee and Cross-Appellant.               :
------------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

      Before the Court is an unusual application – cast as a motion by James W. Giddens, as Trustee for the SIPA Liquidation of Lehman Brothers Inc. (the "Trustee"), "to Confirm the Scope" of this Court's July 16, 2012 Order and Judgment. That Order and Judgment, which held that Barclays was entitled to approximately $4 billion of Margin Assets to support Lehman's exchange-traded derivatives business, was affirmed by the Second Circuit on August 5, 2014. In re Lehman Bros. Holdings Inc., 761 F.3d 303 (2d Cir. 2014). In essence, the instant motion seeks a declaration in 2015 that certain assets are not included in the Margin Assets that were the subject of this Court's prior Order and Judgment in 2012, and were therefore not part of the appeal to the Second Circuit in 2014. The

amount at issue on this motion is approximately $1.3 billion. Barclays Capital Inc. and Barclays Bank PLC (together "Barclays") oppose the motion.

The Court has received substantial briefing on this motion (see ECF Nos. 66, 67, 70, 72) and heard oral argument on January 16, 2015 (Transcript at ECF No. 76). At the outset of the oral argument, the Court expressed a number of concerns with the procedural posture of the instant motion: that there is no such thing as a motion for "clarification" – though such are often made to district courts[1]; that, in effect, any such motion should have been made long ago and prior to the appeal to the Second Circuit; that to the extent the Trustee seeks a new ruling on a new issue, it is unclear whether this Court has jurisdiction as the "Lehman Bankruptcy" matters remain before Bankruptcy Court; that this Court has appellate jurisdiction (and while this Court could withdraw the reference, it declines to do so); and that ultimately any order from this Court on the issue now before it may not be appealable to the Second Circuit. The parties nonetheless expressed a keen and mutual desire for clarity from this Court.[2]

Accordingly, this Court issues the instant Order pursuant to its general authority under Rule 1 of the Federal Rules of Civil Procedure, that a court should

---

[1] The Trustees point to N.A. Sales Co., Inc. v. Chapman Industries Corp., 736 F.2d 854, 858 (2d Cir. 1984) which affirmed a clarifying order specifying conduct which would be in violation of an injunction. "Clarifications of orders previously issued, which may be obtained on motion or made sua sponte by the court, add certainty to an implicated party's efforts to comply with the order and provide fair warning as to what future conduct may be found contemptuous." Id.

[2] This Court mentioned that one possibility was for the Trustee to transfer what it deemed appropriate, allowing Barclays to move for contempt if it chose to do so. (Transc. at 03:10 – 03:24.) Both parties agreed that having to risk contempt created a host of additional issues. (Id. at 08:02 – 08:12.)

construe the rules "to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

The core question on the motion now before the Court is whether its 2012 decision, as affirmed by the Second Circuit, entitled Barclays to all Margin Assets – or only those assets which were (at the time of the sale) securing open trading positions.  For the reasons set forth below, the Court's Opinion and Judgment of July 16, 2012 included those assets which the Trustee seeks here to exclude.  The Trustees' motion to confirm the scope to the judgment to something narrower is therefore DENIED.

I.   BACKGROUND PERTINENT TO THIS MOTION

The facts relevant to the instant motion are set forth in detail in both this Court's prior Opinion, 478 B.R. 570 (S.D.N.Y. 2012), and that of the Second Circuit, 761 F.3d 303 (2d Cir. 2014).  The Court recites here only those facts necessary to resolution of this motion.

On September 16, 2008, Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI") and certain of their affiliates (together, "Lehman") entered into an Asset Purchase Agreement (the "APA") under which Lehman agreed to sell the majority of its assets to Barclays.  This sale was "the largest, most expedited and probably the most dramatic asset sale that has ever occurred in bankruptcy history."  See In re Lehman Brothers Holdings Inc., 445 B.R. 143, 148-49 (Bankr. S.D.N.Y. 2011.)  The APA defined the assets that would be "Purchased" by Barclays and those that would be "Excluded" from that purchase.  The APA defines the

"Purchased Assets" broadly as all the assets of Lehman that were "used in connection with the Business" and were within the scope of the seller warranty stating that "all of the necessary assets and services used by the Seller and its Affiliates to operate the Business as it is currently operated." (R. 10.)[3] The assets to be "Purchased" included, inter alia, Retained Cash, all deposits and prepaid charges and expenses, and "exchange traded derivatives." (Id.) The assets that were to be "Excluded" from the "Purchase" were set forth in Section 1.1 of the APA, and encompassed "all cash, cash equivalents, bank deposits or similar cash items of LBI and its Subsidiaries (the 'Retained Cash') other than $1.3 billion in cash, cash equivalents, bank deposits or similar cash items," as well as "all assets primarily related to . . . derivative contracts." (R. 6, 8.)

In a Clarification Letter dated as of September 20, 2008, the parties modified the definition of Purchased Assets to include, inter alia, "(C) exchange traded derivatives (and any property that may be held to secure obligations under such derivatives) and collateralized short-term agreements." (R. 62.) "Excluded Assets" was defined as to "not include any and all property of any customer, or maintained by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business." (Id.) Regarding the Transfer of Customer Accounts, paragraph 8 of that letter states that "All customer accounts of LBI (other than customer who are affiliates of LBI) shall be transferred to Purchaser." (R. 64.)

---

[3] Citations to "R. _____" refer to the record submitted in the bankruptcy cross-appeals.

The parties came before the Bankruptcy Court to determine whether certain assets acquired by Barclays were part of the sale.  The Bankruptcy Court evaluated groups of disputed assets after (i) a motion by Barclays to secure delivery of certain undelivered assets and (ii) a motion by the Trustee for relief from the Sale Order regarding the Margin Assets, requesting that those assets be returned to the Trustee.  See In re Lehman, 445 B.R. at 148, 150.  While entertaining those motions, the Bankruptcy Court also considered motions brought pursuant to Rule 60(b) of the Federal Rules of Civil Procedure for relief from the order approving the Sale to Barclays.  Id. at 148.  In connection with both sets of motions, the Bankruptcy Court held a hearing over thirty-four days in 2010 and found that it "provided an opportunity to review in slow motion and from multiple vantage points the circumstances of an acquisition that had to proceed so very quickly."  Id. at 149.

In its 2011 Opinion, the Bankruptcy Court stated, "The Margin Assets that are in dispute consist of a total of approximately $4 billion in cash and cash equivalents held at the OCC, other clearing corporations and exchanges, certain banks, and certain foreign futures brokers in connection with derivatives trading."[4] Id. at 195. The court also stated that the "Margin Assets consist of LBI property used to support trading conducted by LBI on its own behalf and on behalf of its customers and affiliates."  Id.  That court then noted that "[t]he parties disagree as to whether these Margin Assets were purchased in connection with the acquisition

---

[4] The court continued, "This total includes nearly $2.3 billion in assets posted by LBI at the OCC, primarily in connection with LBI's options trading business, an additional $1.2 billion at foreign brokers or affiliates and approximately $400 million in domestic exchanges in connection with LBI's futures trading." Id.

5

or were excluded from the sale to Barclays." Id.  In its Opinion, the Bankruptcy Court dealt with the Margin Assets in an undifferentiated manner and granted the Trustee's motion with regard to relief.  At no point did that court distinguish treatment of Margin Assets then being used to support open trading positions with Margin Assets which did not (at the time of the sale) support open positions.

In its opening brief on appeal to this Court, Barclays argued that "the Margin Assets at issue consist of proprietary LBI assets (i.e. assets owned by LBI) that were held in LBI's various ETD accounts to secure its ETD obligations. [R. 66878]."[5] (Opening Appeal Br. at 11, ECF No. 16.)  In a footnote, Barclays continues, "Most of the Margin Assets secured ETDs in LBI's proprietary accounts, but some secured ETDs in LBI's customer accounts. [R.66878; R.8354; R.3697-3706].  While customers would provide assets to LBI to secure their ETDs ('Customer Margin'), it was LBI's responsibility (assumed by Barclays) to ensure these customer ETDs were fully secured. [R.58470-71]." (Id., at 11, n.4.)

The briefing before this Court on appeal did not distinguish between categories of Margin Assets.  The Trustee's brief confirmed that Barclays' appeal encompassed the same universe of Margin Assets (of approximately $4 billion) that were in dispute at trial before the Bankruptcy Court.  (See Trustee Br., ECF No. 24.)  The brief cited the Bankruptcy Opinion in defining the Margin Assets as "consist[ing] of approximately $4 billion of LBI's cash and cash equivalents that LBI

---

[5] R. 66878 refers to a subsection of the 2011 opinion by the Bankruptcy Court titled "Margin Assets". The section can also be found at In re Lehman Brothers Holdings Inc., 445 B.R. 143, 195-99 (S.D.N.Y. 2011.)

6

posted at clearing corporations, exchanges, banks, and futures brokers to support its derivatives trading" and stated that "The Bankruptcy Court awarded the Margin Assets to the Trustee." (Id. at 10-11, 21.)

This Court's 2012 Opinion recited the description of Margin Assets as that in the Bankruptcy Opinion, but noted that "the Margin Assets held at the Options Clearing Corporation ("OCC") were only LBI proprietary margin assets, not LBI customer margin." In re Lehman, 487 B.R. at 577-78 (citing the Bankruptcy Court's Opinion In re Lehman, 445 B.R. at 195 and Tr. at 17:3–17:4, 17:7–17:8 of the April 20, 2012 oral argument). In a footnote accompanying that statement, this Court quoted the Bankruptcy Court's definition of Margin Assets in full from page 195, with additional language from the Bankruptcy Court's Opinion at 198 (referring to approximately $2 billion of customer property held as margin for futures positions of LBI's customers, along with additional customer property held to secure positions.) Id. at 578. This Court stated that "the amount in dispute on Barclays' appeal before this Court is the full $4 billion of Lehman proprietary margin maintained on Lehman's behalf at various financial institutions." Id. at 577 n.5.

After additional discussion, this Court concluded that "the agreements clearly provide for a sale of all Margin Assets to Barclays." Id. at 594.  In its Judgment, this Court reversed the Bankruptcy Court's judgment regarding the Margin Assets. (ECF No. 42, ¶ 1(b).)  It further directed the Bankruptcy Court to "order the Trustee to transfer to Barclays the value as of the date of this Judgment of all Margin Assets that are in his possession, including any earnings received on those assets,

7

and including any cash into which any such assets have matured or been converted plus any earnings on that cash . . . (ii) to order the Trustee to transfer to Barclays the value of any Margin Assets that may in the future come into the Trustee's possession, which value is to be determined as of the date that the Trustee receives those assets, including any earnings received on those assets, and including any cash into which any such assets have matured or been converted plus any earnings on that cash, and to cooperate with Barclays in causing the delivery to Barclays, as soon as practicable, of any and all Margin Assets not yet delivered to Barclays and currently in possession of third parties." (Id. ¶ 1(c).)

The Trustees appealed this Court's Order and Judgment to the Second Circuit. The Second Circuit described the Margin Assets at issue on appeal similarly as consisting of "approximately $4 billion that had been maintained by LBI in accounts at various financial institutions as collateral in connection with its exchange-traded derivative ("ETD") business. The assets in dispute were LBI property and pledged by LBI to support its own and customer trading." In re Lehman, 761 F.3d at 309. The Court stated further, "It is undisputed that Barclays purchased LBI's ETD business. The dispute is over whether the Margin Assets supporting the ETD business, in the form of cash or cash equivalents, were transferred along with the ETD business by operation of the various documents at issue." Id. The Second Circuit then reviewed the contractual documents and determined that the "[e]xclusion [], pertaining to 'cash,' explicitly does not apply to those assets deemed 'Purchased,' and the Margin Assets fall under that term's plain

8

meaning in the agreements." Id. at 311. "Cash or cash equivalents pledged as collateral are encumbered and not ready for use. Moreover, it would be highly unusual for a buyer to purchase LBI's ETD business in its entirety but not the collateral that allowed that business to exist . . . Indeed, notwithstanding LBI's desperate need for 'cash,' it did not liquidate the Margin Assets because doing so would have destroyed the ETD business, which it wanted to sell." Id. The Court then stated, "If the Margin Assets were not to be conveyed, we would expect a clear expression of such an intent." Id. The Court also declined to create ambiguity and conflict where there was none in reading the documents as a whole. Id. at 312.

      The Trustee then moved for a writ of certiorari. In his petition in support of that writ, the Trustee raised, among other issues, those arising from this Court and the Second Circuit's rulings with regard to the Margin Assets. He refers to the Margin Assets as "$4 billion in cash" and possibly "an extra $1.1 billion" (emphasis added). Petition for Writ of Certiorari, No. 14-710 (Dec. 15, 2014), at *17. The Trustee argued that "Whatever minimal amount of due process is required to meet the constitutional standard in a contested asset sale under Section 363 . . . it is assuredly not met in this case, where no notice of the transfer of $4 billion in Margin Assets cash was provided to any interested party…" Id. at 24-25 (emphasis in original). That petition also stated that the Second Circuit had modified the transaction by reading the Clarification Letter as including the $4 billion in Margin Assets. Id.

II. THE TRUSTEE'S ARGUMENTS

The Trustee argues that the decisions of this Court and the Second Circuit were made "with respect to property, in an amount estimated to be approximately $4 billion, that secured obligations under exchange-traded derivatives Barclays purchased from LBI in September 2008." (Corrected Trustee's Br. at 1, ECF 67.) In essence, the "property" to which the Trustee here refers are the Margin Assets discussed above. "Barclays, however, it taking the position that the Judgment covers not only that property that was the subject of the proceedings in this Court and the Second Circuit, but also an additional $1.3 billion." (Id.)

According to the Trustee, the $1.3 billion is comprised of two pieces. The first piece is $595 in what he refers to as "Residual Cash", "consisting of LBI-owned cash and cash equivalents in accounts that did not contain any exchange-traded derivatives when the sale closed." (Id.) It therefore did not secure any derivatives "when the sale closed." (Id.) The Trustee then argues that Barclays "declined to assert any entitlement to the Residual Cash during the previous proceedings before this Court or during the subsequent appeal to the Second Circuit." (Id.) The second piece of the $1.3 billion is $710 in what he refers to as "Affiliate Collateral". He defines Affiliate Collateral as "consisting of cash and cash equivalents that secured the derivatives owned by LBI affiliates (the 'Affiliate Derivatives')." (Id. at 2.) The Trustee asserts that "Barclays did not purchase the Affiliate Derivatives in the sale. Nor did it assume the more than $3 billion in claims filed by LBI affiliates against the LBI estate in respect of the Affiliate Derivatives and Affiliate Collateral." (Id.)

10

The Trustee argues that when the sale to Barclays closed on September 22, 2008, LBI "held fourteen accounts with clearing brokers that previously had been used for exchange-traded derivatives trading, but that no longer contained any derivatives. All of the derivative positions in these accounts had been closed out by September 19, 2008." (Id. at 6.) In terms of the Affiliate Derivatives, the Trustee argues that while LBI traded exchange-traded derivatives on its own behalf and on behalf of its customers, the Affiliate Derivatives "consist entirely of futures that were traded through brokers and exchanges other than the OCC." (Id. at 8.) "Some of the Affiliate Derivatives were traded in accounts LBI used exclusively for affiliate trading at the time of the sale, while other Affiliate Derivatives were traded in 'mixed' accounts that LBI used for affiliate trading in addition to customer and/or proprietary trading." (Id.)

The Trustee states that Barclays did not argue that it was entitled to the Residual Cash before the Bankruptcy Court, but concedes that Barclays did argue in its initial position before the Bankruptcy Court that it was entitled to "all" property used to secure obligations under any and all exchange-traded derivatives and "expressly claimed the Affiliate Collateral." (Id. at 9-10.) The Trustee further acknowledges that as Barclays "had put the disposition of Affiliate Collateral at issue," the Bankruptcy Court expressly included Affiliate Collateral in its decision and definition of the Margin Assets. (Id.)

At base, the Trustee argues that Barclays has waived any claim to the Margin Assets which he has categorized as Residual Cash and Affiliate Collateral

11

because Barclays chose to define the appeal as a dispute over collateral for the derivatives it acquired – and not in terms of derivatives it did not acquire. (Id. at 3.) In other words, the Trustee argues that Barclays did not pursue any entitlement to Affiliate Collateral on appeal to this Court, and that it was therefore not included within this Court's Opinion and Judgment, nor could it have been an issue before the Second Circuit. Barclays' definition of Margin Assets as used in its appeal to this Court and then carried into the Second Circuit narrowed the definition of Margin Assets as used in the Bankruptcy Court, and it excluded the Affiliate Collateral and Residual Cash.

Barclays disputes the characterization of the amounts at issue on this motion and the scope of its appeal to this Court and the Second Circuit. According to Barclays, its appeal to this Court concerned all Margin Assets, which included both categories comprising the $1.3 billion at issue on this motion. Barclays argues that it is not seeking any additional categories of Margin Assets but rather is seeking only that to which this Court's prior Judgment and the Second Circuit have determined it is entitled. According to Barclays, the $1.3 billion arises from the substantial appreciation of some of the assets underlying the "$4 billion" repeatedly described in an undifferentiated manner as Margin Assets throughout the courts' decisions. Barclays argues that after the "$4 billion" estimate was made and used as a reference point for the Margin Assets in the earlier proceedings, additional Margin Assets were identified that "indisputably fall within categories always claimed by Barclays." (Barclays' Opp. Br. at 1-2, ECF No. 70.) In terms of

"Residual Cash", Barclays proffers its own term for the assets in dispute: "Subsequently Identified Margin Assets." (Id. at 2.) According to Barclays, its position on this motion is confirmed, in part, by the fact that the Trustee agrees that Barclays is entitled to most of the Subsequently Identified Assets, just not the subset that is the subject of this motion. (Id.) In terms of Affiliate Collateral, Barclays argues that the $700 million in Margin Assets that comprise that category were always included within the "$4 billion" number repeatedly referenced in the decisions of the courts. (Id.)

Barclays argues that far from waiving any assets on appeal, it intended to and did use the broadest definition of Margin Assets throughout its arguments, that of the Bankruptcy Court. (Id. at 2-3, and R.66878). Barclays states that the assets which are the subject of this motion are:

> (1) LBI proprietary assets held in accounts at clearing organizations and banks to secure some of the ETDs that LBI cleared on behalf of its affiliates ("Newly Disputed Margin for Affiliate ETDs"), and (2) LBI proprietary assets held in accounts at clearing brokers through which LBI cleared ETDs on behalf of customers, but which had no open ETD positions on the day the Sale closed ("Newly Disputed Customer Account Margin").

(Id. at 3.) Barclays argues that "Both categories were included in the definition of Margin Assets Barclays sought throughout the Bankruptcy Court trial, and continued to seek on appeal." (Id.) Barclays argues that any waiver was by the Trustee – that it made an "all or nothing argument" that Barclays was not entitled to any Margin Assets; and it cannot now seek to make new arguments. (Id. at 6.)

III.     LEGAL POSITIONS

The Trustee argues that as a matter of law – and particularly appellate practice – Barclays has waived any argument that it is entitled to Residual Cash or Affiliate Collateral.  The Trustee focuses principally on Federal Rule of Appellate Procedure 28 which sets forth the requirements for raising issues on appeal.  Fed. R. App. P. 28.  Neither party contests that issues not raised on appeal have been waived.  Rule 28 requires that the summary of argument contain appellant's contentions and the reasons for them; and that the argument itself must contain appellant's contentions and the reasons for them along with citations to authorities and the record. Fed. R. App. P. 28(a)(7), (8)(A).

In Niagara Mohawk Power Corp. v. Hudson River – Black River Regulating District, 673 F.3d 84, 107 (2d Cir. 2012), the Second Circuit addressed whether two cursory references in an appeal brief presented a question for appellate review.  The district court had, inter alia, dismissed a party below.  The appeal addressed a number of questions and made only cursory mention – and contained no specific argument – of the dismissal of the party (DEC).  The Second Circuit held, "These cursory, conclusory references do not present for appellate review the question of whether the district court properly dismissed the DEC from this action." Id. at 107. "'Merely mentioning' or '[s]imply stating' an issue in an appellate brief is insufficient to preserve it for our review: an appellant must 'advance an argument,' and we generally will decline to consider issues that are 'not sufficiently argued.'" Id. (citing Gross v. Rell, 585 F.3d 72, 95 (2d Cir. 2009)). The Court further noted

that "'It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" Id. (quoting Tolbert v. Queens Coll., 242 F.3d 58, 75 (2d Cir. 2001)).  The Trustees argue, in other words, that Barclays had to not only mention the Affiliate Collateral, but also had to argue for the Affiliate Collateral.  They assert that after overreaching in the Bankruptcy Court, Barclays made a strategic decision not to argue for the Affiliate Collateral.  (Tr. 17:07-21.)

The Trustee also refers in passing to the doctrine of judicial estoppel, citing Intellivision v. Microsoft Corp., 484 Fed. Appx. 616, 622 (2d Cir. 2012) (judicial estoppel precludes plaintiffs from "asserting new, inconsistent position as to the ownership of property.")  The Trustee's discussion of judicial estoppel is not further developed beyond a single sentence included in its opening brief.  (Trustee Br. at 21-22.)

Barclays does not argue with these principles; but they contend that they are inapplicable here.  Barclays argues that a trial court is barred from modifying a decision that has been ruled on by the court of appeals.  See Burrell v. United States, 467 F.3d 160, 165 (2d Cir. 2006).  Thus, any decision of this Court "should not be inconsistent with either the express terms or the spirit of the mandate."  In re Ivan F. Boesky Sec. Litig., 957 F.2d 65, 69 (2d Cir. 2002).  Additionally, the "mandate rule" forecloses consideration of issues that could have been raised on appeal but were not.  See United States v. Vidal, 136 Fed. Appx. 438, 439-40 (2d Cir. 2005).

Barclays also counters that the $4 billion of Margin Assets sought before the Bankruptcy Court includes all Margin Assets, irrespective of category – and thus includes the same $4 billion discussed before this Court in 2012. Put simply, no category of Margin Assets was carved out in the appeal before this Court and that is evidenced by the uniform references to "$4 billion." Barclays points, for example, to a declaration submitted before the Bankruptcy Court that includes a $150 million Macquarie account Barclays sought because it was an "Undelivered Margin from Proprietary Futures Account". (R.3704.) That same $150 million Macquarie account is listed as "Residual Cash" in a declaration pertaining to the instant motion. (Corrected McCoubrey Decl., Ex. 1, ECF No. 68.) They argue then that there is no question they have sought all Margin Assets in all categories.

IV. DISCUSSION

The issues raised by the Trustee on this motion come too late. Whether the Trustee's points regarding Barclays' tactical choices to support its argument would have had merit and resulted in a different decision before this Court in 2012 or in the Second Circuit is now academic. Both appeals – that of the Bankruptcy Court's order and that of this Court – have occurred. And both appeals encompassed determinations that Barclays is entitled to all Margin Assets.

There is ample basis in the decisions and briefs below to find that Barclays sought and obtained reversal of the Bankruptcy Court's determination with regard to the overall category of Margin Assets. Margin Assets were discussed in an undifferentiated manner in that decision, before this Court referring to that

decision, and in the Second Circuit incorporating the same. While it is true that Barclays argued that separating cash from derivative positions would make no sense, that alone does not foreclose its entitlement to all Margin Assets. Indeed, the primary argument related to whether cash could move at all; that argument does not distinguish between ETD accounts with open or closed positions.

Barclays' arguments referenced the broadest possible definition of Margin Assets. This breadth does not create a waiver as to granular components of such assets. Rather, the breadth captures all. It was up to the Trustee to raise Barclays' position as to cash securing derivative positions as either carving out a category of assets, or, if not, diminishing the persuasiveness of its argument. Those points were not made then and cannot be raised now.

In effect, it is the Trustee that needed to preserve its position, and it did not.

V. CONCLUSION

The scope of this Court's Judgment originally set forth on July 16, 2012, as affirmed by the Second Circuit, is clear: Barclays is entitled to all Margin Assets. The Trustee's motion is DENIED.

The Clerk of Court is directed to close the motion at ECF No. 49.

SO ORDERED.

Dated:   New York, New York
         April 22, 2015

                                    KATHERINE B. FORREST
                                    United States District Judge